**AFFIRM; and Opinion Filed June 19, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-00749-CV

## WAL-MART STORES TEXAS, LLC, Appellant
## V.
## DAWN BISHOP, Appellee

**On Appeal from the 162nd Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-14-00763**

## MEMORANDUM OPINION

Before Justices Lang-Miers, Fillmore, and Stoddart
Opinion by Justice Fillmore

Wal-Mart Stores Texas, LLC (Walmart) appeals the trial court's judgment on a jury verdict

in favor of Dawn Bishop finding Walmart negligent on a theory of vicarious liability and awarding

damages to Bishop for personal injuries sustained when a box fell from a shelf in a Walmart store

and struck her on the head. In six issues, Walmart argues: (1) the evidence was legally insufficient

and, alternatively, factually insufficient to support the jury's finding that the negligence of

Walmart's employee proximately caused the box to fall from the shelf; (2) the evidence was legally

insufficient and, alternatively, factually insufficient to support the jury's finding that Bishop's

injury was proximately caused by the box falling on her head, and the trial court committed

reversible error by permitting Bishop to offer expert testimony when the expert had not been

adequately disclosed and was not a proper rebuttal witness; (3) the trial court abused its discretion

by denying Walmart's Motion for Leave to File Counteraffidavits under civil practice and remedies code section 18.001, and refusing to allow Walmart to present expert witness testimony at trial on the reasonableness and necessity of Bishop's medical expenses; (4) the trial court committed reversible error by submitting an ambiguous question concerning vicarious liability in the jury charge; (5) the evidence was factually insufficient to support the jury's damage award for physical pain, legally and factually insufficient to support the jury's damage award for mental anguish, and factually insufficient to support the jury's damage award for physical impairment; and (6) the trial court committed reversible error by allowing improper jury argument by Bishop's counsel.  We affirm the trial court's judgment.

## Background

On July 7, 2012, Bishop went to a Walmart store to shop for curtains.  While on her way to the curtain department, she entered a clearance section in an area previously occupied by a fast food restaurant.  There is no dispute the clearance section was open to customers.  At trial, Bishop testified there was no caution sign or other indication the clearance section was dangerous or posed a risk of injury.  Photographs of the clearance section introduced into evidence depict multiple adjustable, four to five tiered, metal shelving racks on wheels, sitting side by side in aisles and along the walls.  The shelves appear full to capacity with stacked merchandise, some of which is haphazardly arranged.  At trial, Bhola Gajurel, the Walmart employee whose negligence was imputed to Walmart under a theory of vicarious liability, confirmed the photographs accurately depicted the clearance section on the day of the accident.

Randy Dill, the Walmart manager who filled out an incident report with Bishop immediately after the accident, testified that Walmart used temporary shelving units on wheels called "plant racks" in the clearance section.  He did not know whether the wheels on the plant racks were locked.  Unlike merchandise on the general sales floor, which was arranged and stacked

in accordance with company standards and policies, Walmart "maintain[ed] no policies on how to set up a clearance section," and there was no "rhyme or reason as to how merchandise [was] kept in the clearance section at Walmart." Dill testified that falling merchandise is a serious hazard at Walmart stores, and it is important to train employees concerning the danger posed by falling merchandise and the proper stacking of merchandise on the shelves. Dill indicated that unlike the general sales floor, there is access from either side of the plant racks in the clearance section.

Until Dill arrived after the accident, the only other person in the clearance section with Bishop was Gajurel, who was stacking items on the shelves. According to Bishop, "[Gajurel] was back there shelving and moving things on the shelf" while she was shopping. On the first aisle, Bishop found some curtains, and proceeded to look for more. As she approached the second aisle, she "looked down and saw some curtains that might be what [she] was looking for." Bishop could see Gajurel's lower body on the other side of the shelving unit, and she could hear him stocking merchandise. Bishop testified she "heard him pushing the merchandise that was in the same place where the [box] was." As she was bent down looking at curtains on the lowest rack, a box fell from above and hit her on the back of the head. "[W]hen the box fell [onto Bishop's head] and [she] kind of yelled out," "[Gajurel] came around from the other side [of the shelf]." Bishop testified,

> [H]e came around and he said, I'm sorry and are you hurt. And I asked him: Did it put a – a cut in my hair? Is my head bleeding.
>
> And he stood there and helped the – helped me look, and he said: No, ma'am, it's not any blood there.
>
> And he asked did I need the manager, and I said yes.

Bishop indicated she neither touched the shelves in that row prior to the box falling on her head, nor placed any merchandise back on any of the shelves in that section. Bishop stated she did not see Gajurel cause the box to fall because she was looking down.

According to Bishop, when Dill arrived at the clearance section, he filled out an incident report with Bishop's assistance, and asked Bishop to make a customer statement. While Bishop was standing with Dill in the clearance section filling out the paperwork, Gajurel moved to the other side of the shelf from where Bishop and Dill were located. As Bishop was filling out the paperwork, Gajurel again started shelving items, and "he pushed something – it was a candle . . . off the shelf and onto [Bishop]," "hit[ing her] foot."

The customer statement Bishop filled out immediately after the incident was introduced into evidence at trial,[1] and corroborated Bishop's testimony, stating,

> While shopping in the clearance isles (sic) for curtains a heavy box on the top shelf of a cart fell and hit me on my head. It was a box Cakesickle maker brand Homemade approx 15 lbs.[2] Wile (sic) completing this form a glass candle fell on my foot.

Walmart's incident report also substantiated Bishop's trial testimony. It described the incident as, "Box fell and struck customer on head," and confirmed the incident caused "Bodily injury," specifically, "Neck was hurt." Bishop testified that after leaving the store,

> [She] went home and laid down. [Her] neck had started to get a little stiff and sore, and [she] thought maybe [she] could sleep it off, so [she] laid down for about three hours, got up, told [her] husband [she] wasn't feeling good, and it was getting worse. . . .

At that point, Bishop "went to the emergency room, CareNow."[3] At CareNow, Bishop was diagnosed with a cervical strain and a head contusion caused by the box falling on her head. Because she "started to feel worse," Bishop returned to CareNow the following day, a Sunday, then went to her primary care physician, Dr. Michelle Ho, on Monday. Dr. Ho prescribed physical

---

[1] The customer statement was signed by Bishop and Dill, and dated July 7, 2012.

[2] Bishop testified she did not have an opportunity to weigh the box at the time she filled out the incident report or thereafter. Bishop's statement the box weighed 15 pounds was her "perception" at the time of the accident and while filling out the incident report.

[3] Bishop subsequently clarified that CareNow is an urgent care facility.

therapy.  Bishop completed two courses of physical therapy, which "last[ed] until about January of 2013."

Bishop testified that when she walked into Walmart on July 7, 2012, she did not have any problem with her neck.  After the incident and approximately six months of physical therapy, "[she] was still in the pain.  The pain still didn't go away, so [she] knew that something else was wrong.  It – it never stopped."  Ultimately, Bishop saw a pain management physician; over a six or seven month period, she received thirty-four steroid injections in her neck that required general anesthesia; visited a chiropractor; completed at least four rounds of physical therapy; was examined and treated by more than five physicians, including a neurosurgeon and an orthopedic surgeon; and had cervical fusion surgery resulting in "two cages, . . . a plate and six screws in [her] neck."  Bishop testified,

> I'm still in pain.  It – it's still – I have good days, and I have bad days.  The type of work that I do, sitting at a computer all day, just having to do everyday things, things that you may not think about until you've lived that day, now a day for me, when I get up in the morning and brush my teeth and lean over the sink, that's painful for me.  Taking a shower, that's painful for me.
>
> When I get in the car and I turn right and left, my head right to left, your body just automatically does it, it just moves if you're in traffic or something, but then I'm in pain.  So by the time I get to work, I feel like I've already worked a half a day.
>
> So there's no day for me without pain.  I sit here now with pain. . . .  It's always there.

Evidence at trial showed Bishop continues to experience pain across her neck and shoulders, as well as throbbing in her eyes.  Almost four years after the accident, Bishop, upon the recommendation of her neurosurgeon, still receives physical therapy, and remains under the care of various doctors.

The record indicates Bishop underwent back surgery in 2010 for degenerative disk disease, but never complained about neck pain.  According to Bishop, she was "pain free" and had an active lifestyle prior to the accident.  She is employed as an administrative executive assistant.

Her job duties include typing, planning, special projects, and managerial responsibilities. Outside of work, her everyday activities prior to the accident consisted of spending time with her children and grandchildren; hosting dinners at her house; traveling to Austin to see family; sewing, including ongoing sewing for a ministry; and attending church activities, such as workshops. Bishop indicated she no longer engages in these activities as she used to. She is less active, mentally alert, and creative because she is "in pain all the time." The injury "changed [her] life." Now, she frequently leaves work and goes to bed. Bishop testified, "[Before the injury] I felt like I was in total control. I'm not anymore. The pain controls me."

Gajurel testified that on the day of the accident, he was employed at Walmart as a cashier, and while at work was "very, very sick, so sick that [he] didn't know if [he] could work or not." He was called to rearrange some of the stock in the clearance section, items that "had fallen on – from the places." Gajurel "was barred from lifting heavy goods," including heavy boxes. The evidence at trial showed that Gajurel was not provided training or specific instruction "on what to do" in the clearance section or the "dangers associated with falling merchandise," because he was a cashier and merchandise placement is "the responsibility of the stocker." Gajurel testified he did not "know how or why the box fell off the shelf," he was standing with his "back to Ms. Bishop" and not "on the opposite side of her at the very same rack when this box fell," and he did not hear the box fall. However, a little more than a week before his trial testimony, Gajurel stated in a sworn discovery response that he believed Bishop manipulated the box and caused it to fall. Gajurel further testified he would be fired if he had caused the box to fall and injure Bishop, stating, "If I pushed [the box] then the . . . manager [would] . . . become upset. The manager is going to fire me because if I hurt my customer, the Walmart customer." Gajurel also stated he did not "cause any glass candle to fall in this area on that day."

Walmart's medical expert, Dr. Raymond Peeples, testified that, in his opinion based on a review of Bishop's medical records,[4] Bishop's neck injury was age-related and not caused by the box falling on her head. Dr. Peeples observed that Bishop's medical records showed she underwent lumbar fusion surgery in March 2010 as a result of disk degeneration, yet "still ha[d] pain in her lower back" in June 2011. According to Dr. Peeples, Bishop's lower back pain fifteen months after the lumbar fusion procedure indicated a "failure of surgery." In his opinion, "[n]o traumatic anatomy was discovered after the Walmart event. Findings six months later on cervical MRI were age-related, normal findings of disk bulges." Based upon a review of CareNow records, Dr. Peeples testified Bishop's "scalp showed no lesion. There was no hematoma." In his opinion, a "significant blow" would have resulted in "swelling, discoloration and enlargement," and Bishop had "no objective findings of a scalp abnormality." Because Bishop had "[c]omplaints of neck pain without findings," Dr. Peeples opined she only had "a contusion and strain" as a result of the box falling on her head. Dr. Peeples characterized Bishop's headache after the accident as a "[t]ension headach[e]" which is "frequently brought on by stress, driving, studying too many hours. That's not a headache from a blow to the head that should be present regardless of [one's] activities."

Dr. Peeples further testified that because Bishop's medical records indicated she had "[n]o radiation of pain to arms or hand" on "the day or two" after the accident, she therefore showed no symptoms of nerve injury; and an EMG report on Bishop indicated "there was no evidence of nerve compression or nerve damage." In Dr. Peeples' opinion, after the box fell on her head, Bishop "had symptoms attributed to a strain," that got "steadily better," and then "six months after the event and a recovery," Bishop suffered "[n]ew symptoms" from "a new condition."

---

[4] Dr. Peeples did not physically examine Bishop, and testified he was a paid expert witness for Walmart.

On cross-examination, Dr. Peeples testified he knew the standards maintained by the American Academy of Orthopedic Surgeons for orthopedic expert testimony required orthopedic surgeons to review all pertinent medical records, including prior depositions, before rendering any statement or opinion on the medical or surgical management of the patient. However, Dr. Peeples admitted he had not read Bishop's deposition testimony.

Dr. James Stanley, an orthopedic surgeon and one of Bishop's doctors, testified that in his opinion based on reasonable medical probability, Bishop's neck injury, which ultimately resulted in the need for spinal fusion surgery, was caused by the box falling on her head as she was "bent forward looking down."[5] Dr. Stanley's medical notes reflected,

> [Bishop] had a box fall on her head and sustained an injury. That injury required surgery. To my thinking, that spells out causation . . . .

According to Dr. Stanley, because Bishop was looking down when the box hit her head, "her neck [was] in flexion," which "means that the chin is – closer to the chest." Bishop suffered an "axial flexion injury" because the box fell on her head from above, causing her "neck to flex," which "load[ed] the spine. And flexion . . . is the worst position to load your cervical spine." Dr. Stanley further testified,

> [When] a high school collegiate or professional football player . . . sustain[s] a catastrophic cervical spine injury . . . it's almost always in a flexed spine with an axial load. That's the absolute worst biomechanical position for your neck to be in.
>
> . . . .
>
> [T]he disk is a circular ligament with a jelly inside. The jelly is the actual shock absorber. . . . [The spine] is designed to take loads in extension. So the more flexed you are when you're subjected to an axial load, the more of that force, instead of being dissipated equally, it goes . . . into the nucleus, which is the jelly. And when . . . the center of rotation is forward of where it's . . . supposed to be, the forces that are directed towards . . . the jelly are then directed posterior towards the back.
>
> . . . .

---

[5] Dr. Stanley testified he was not compensated for his testimony.

–8–

[I]n most of us, the weak link is what we call the annulus which is that circular ring around the disk. . . . And so when you get an axial load in a flexed posture and the weak link is the annulus, you get a disk bulge or a disk displacement or sometimes an actual extrusion of disk material. . . . And the place that it typically goes is back towards the spinal canal.

Dr. Stanley opined that, based on his review of Bishop's medical records, Bishop did not suffer from any type of degeneration in her spine, and "[Bishop's] pain and resultant medical care and medical treatment . . . [did not have] anything to do with degeneration in her cervical spine at all."

A jury found that Gajurel was negligent while acting within the course and scope of his employment, his negligence proximately caused Bishop's injury, and Walmart therefore was negligent on a theory of vicarious liability. The jury awarded damages to Bishop in the amount of $1,393,484.52, upon which the trial court rendered judgment.

## Analysis

In six issues, Walmart argues: (1) the evidence was legally insufficient and, alternatively, factually insufficient to support the jury's finding that the negligence of Walmart's employee proximately caused the box to fall from the shelf; (2) the evidence was legally insufficient and, alternatively, factually insufficient to support the jury's finding that Bishop's injury was proximately caused by the box hitting her head, and the trial court committed reversible error by allowing Dr. Stanley to offer expert testimony when his testimony had not been adequately disclosed and he was not a proper rebuttal witness; (3) the trial court abused its discretion by denying Walmart's Motion for Leave to File Counteraffidavits under section 18.001 of the civil practice and remedies code, and refusing to allow Walmart to present expert witness testimony at trial on the reasonableness and necessity of Bishop's medical expenses; (4) the trial court committed reversible error in submitting an ambiguous question concerning vicarious liability in the jury charge; (5) the evidence was factually insufficient to support the jury's damage award for

–9–

physical pain, legally and factually insufficient to support the jury's damage award for mental anguish, and factually insufficient to support the jury's damage award for physical impairment; and (6) the trial court committed reversible error by allowing improper jury argument by Bishop's counsel.

### Sufficiency of the Evidence

#### Standard of Review

When, as here, an appellant attacks the legal sufficiency of the evidence to support an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that no evidence supports the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011); *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). In determining whether the evidence is legally sufficient to support a finding, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 821–22 (Tex. 2005). We credit favorable evidence if reasonable jurors could do so, and disregard contrary evidence unless reasonable jurors could not. *Id.* "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827.

A legal sufficiency challenge will be sustained when there is a complete absence of evidence of a vital fact; the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; the evidence offered to prove a vital fact is no more than a mere scintilla; or the evidence conclusively establishes the opposite of the vital fact. *See id.* at 810; *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). If there is more than a scintilla of evidence supporting the jury's finding, the legal sufficiency challenge must fail. *Id*. There is more than a scintilla of evidence "when the evidence as a whole rises to a level enabling

reasonable and fair-minded people to have different conclusions." *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014). However, if the evidence is so weak that it only creates a mere surmise or suspicion of its existence, it is regarded as no evidence. *Id.* at 156.

In considering a challenge to the factual sufficiency of the evidence, we review the entire record and may set aside the verdict only if it is against the great weight and preponderance of the evidence. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). A finding is against the great weight and preponderance of the evidence if it is clearly wrong, manifestly unjust, or "shocks the conscience." *Id.* The factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819 (legal sufficiency review); *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761 (factual sufficiency review). We may not substitute our own judgment for that of the factfinder merely because we might reach a different result. *City of Keller*, 168 S.W.3d at 819, 822–23; *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761.

*Proximate Cause Element of Negligence Claim*

To establish a negligence claim, the plaintiff must prove the defendant owed a duty to the plaintiff, the defendant breached that duty, and the breach proximately caused the plaintiff's injury. *Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608, 613 (Tex. 1996). "The components of proximate cause consist of cause in fact and foreseeability." *Rogers v. Zanetti*, 518 S.W.3d 394, 402 (Tex. 2017). These elements cannot be established by mere conjecture, guess, or speculation. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). Proximate cause may, however, be established by either direct evidence or circumstantial evidence and reasonable inferences drawn from that evidence. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 459 (Tex. 1992).

–11–

Cause in fact requires "proof that (1) the negligent act or omission was a substantial factor in bringing about the harm at issue, and (2) absent the negligent act or omission ('but for' the act or omission), the harm would not have occurred." *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016) (quoting *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l. Dev. & Research Corp.*, 299 S.W.3d 106, 122 (Tex. 2009)). If a negligent act or omission merely creates the condition that makes the harm possible, it is not a substantial factor in causing the harm as a matter of law. *See id.*; *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 800 (Tex. 2004). "The evidence must go further, and show that such negligence was the proximate, and not the remote, cause of resulting injuries . . . [and] justify the conclusion that such injury was the natural and probable result thereof." *Doe*, 907 S.W.2d at 477. However, the plaintiff need not exclude all possibilities; it is sufficient to prove that the greater probability is that the defendant's conduct, alone or in contribution with others, was the cause of the harm. *First Assembly of God, Inc. v. Tex. Utils. Elec. Co.*, 52 S.W.3d 482, 493 (Tex. App.—Dallas 2001, no pet.). Nor must the defendant's negligence be the sole cause of the injury. *Havner*, 825 S.W.2d at 459. The issue is whether there is any evidence from which reasonable minds could draw an inference that the defendant's negligent act caused the plaintiff's injury. *Id.* "Whether other possible inferences may be drawn from the evidence is not the relevant inquiry." *Id.*

A plaintiff proves foreseeability of the injury by establishing that "a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission." *Stanfield*, 494 S.W.3d at 97 (quoting *Doe*, 907 S.W.2d at 478). It is not necessary for the particular accident complained of, or the precise manner in which the injury occurred, to be foreseeable. *See Doe*, 907 S.W.2d at 478. All that is required is the injury be of a general character that might be reasonably contemplated as a result of the defendant's conduct. *Id.* Foreseeability should be measured in the light of common experience applied to human conduct. *Id.*

*Proximate Cause of Accident*

In its first issue, Walmart contends the evidence was legally insufficient and, alternatively, factually insufficient to support the jury's finding that Gajurel was negligent, and his negligence proximately caused the box to fall from the shelf and hit Bishop on the head. The jury was given the following instructions:

> "**NEGLIGENCE**" means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.
>
> "**ORDINARY CARE**" means that degree of care that would be used by a person or ordinary prudence under the same or similar circumstances.
>
> "**PROXIMATE CAUSE**" means a cause, that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

A single liability question was presented to the jury:

QUESTION 1

> Did the negligence, if any, of Wal-Mart, proximately cause the occurrence in question:
>
> Wal-Mart was negligent if Bhola Gajurel was negligent while acting within the course and scope of his employment.
>
> Answer "Yes" or "No"
>
> Answer: _____

The jury answered "Yes." Walmart argues the evidence was legally insufficient to support the jury's finding that Gajurel was negligent because there was no evidence as to what caused the box to fall from the shelf; what standard of care applied; or what conduct by Gajurel violated the standard of care. Walmart argues in the alternative that the evidence is factually insufficient to support the jury's finding.

As to cause in fact, there is evidence of record indicating Bishop was injured when a box on the upper shelf of a temporary, wheeled shelving system in the clearance section fell on her head as she was bent down looking at curtains on the bottom shelf. Immediately preceding the accident, Bishop saw Gajurel's lower body on the other side of the rack, and heard him stocking, moving, and pushing merchandise around in the same area occupied by the box before it fell. Dill, the Walmart manager who went to the clearance section to assist Bishop immediately after the accident, testified that merchandise falling from shelves was a "serious hazard" at Walmart, and employees assigned "zoning" duties (i.e. stacking and shelving merchandise) were trained on the "danger of falling merchandise." Unlike merchandise on the general sales floor, which was specifically arranged and stacked in accordance with standards, policies, and a "modular" sent to the stores by Walmart's corporate offices that provide instructions on "where to exactly put each individual box" on a shelf, the merchandise in the clearance section was haphazardly stacked, with "no rhyme or reason" as to the arrangement of the items. Walmart did not have any standards or policies that applied to the arrangement of merchandise in the clearance section. The evidence also showed that Walmart invited and intended for customers to enter the clearance section.

Although he was employed and trained as a Walmart cashier, Gajurel was in the clearance section at the time of the accident re-arranging and stacking items on the temporary shelving units. Gajurel admitted he did not know "what to do" or how to properly stack the items, and had not been informed of the dangers of falling merchandise. At trial, Gajurel testified he did not know how or why the box fell, yet his sworn discovery response just a week prior to his testimony blamed Bishop for manipulating the box and causing it to fall. Gajurel further testified he would be fired if he had caused the box to fall and injure Bishop. Gajurel denied causing a glass candle to fall and hit Bishop's foot despite Bishop's contemporaneous documentation of that event in the incident report she filled out while standing in the clearance section with Dill.

–14–

As to foreseeability, Dill testified that because Walmart was aware of the "serious hazard" posed by merchandise falling from shelves and injuring shoppers, Walmart's own standards and policies required employees charged with stocking items on shelves to receive training on how to properly shelve items to prevent merchandise from falling and injuring someone – training and knowledge Gajurel lacked. Gajurel admitted he did not know "what to do" while stacking, shelving, and re-arranging merchandise in the clearance section, a customer shopping space that was not subject to store standards or policies regarding the stocking and placement of store merchandise.

From this evidence, the jury could reasonably infer that the box fell due to Gajurel's negligent actions moving and stacking merchandise on the shelves in the clearance section, and Walmart could reasonably foresee that boxes and other merchandise haphazardly stacked in the clearance section could fall and injure a customer. While there was conflicting evidence as to Gajurel's precise whereabouts in the clearance section at the moment the box fell on Bishop, the jury was entitled to believe Bishop's testimony and reject any conflicting testimony.

We conclude there was more than a scintilla of evidence from which the jury could reasonably have drawn the inference that Gajurel's actions in moving and shelving merchandise in the clearance section without the benefit of standards or policies for stocking merchandise on the temporary, wheeled shelving units in that section, and without knowledge of "what to do" or training on how to stock and shelve merchandise in that section, proximately caused the box to fall on Bishop's head. Thus, the evidence was legally sufficient to support the jury's finding that Gajurel was negligent and that his negligence was the proximate cause of the box falling from a shelf and hitting Bishop on the head. *King Ranch*, 118 S.W.3d at 751. Further, the issue of proximate cause is one of fact for determination by the jury, and the jury's finding of negligence was not so against the great weight and preponderance of the evidence that it is clearly wrong,

–15–

manifestly unjust, or shocks the conscience. *Golden Eagle Archery*, 116 S.W.3d at 761. Therefore, we conclude the evidence was factually sufficient to support the jury's finding that Gajurel was negligent and that his negligence was the proximate cause of the box falling from a shelf and hitting Bishop on the head. We resolve Walmart's first issue against it.

*Proximate Cause of Injury*

In its second issue, Walmart complains the evidence was legally insufficient and, alternatively, factually insufficient to support the jury's finding that Bishop's injury was caused by the box hitting her head. The record, however, contains testimony and documentary evidence from which the jury could reasonably infer that the box falling from a shelf was the proximate cause of Bishop's neck injury.

Bishop testified that she did not have any problem with her neck when she walked into Walmart on July 7, 2012. The testimonial and documentary evidence at trial showed that her neck was injured when the box fell on her head. Walmart's incident report stated, "Box fell and struck customer on head," causing "bodily injury," specifically, "Neck was hurt." Within hours of the accident, Bishop went to an urgent care facility, where she was diagnosed with a cervical strain and a head contusion. She returned to the urgent care facility the next day, and visited her doctor on the third consecutive day following the accident. Thereafter, Bishop continuously received treatment from physicians and other health-care providers, including physical therapy and invasive surgery resulting in the placement of two cages, a plate, and six screws in her neck. At the time of trial, Bishop remained under the care of physicians and other health-care providers, including treatment and physical therapy for her neck pain.

Dr. Stanley testified that, based on reasonable medical probability, Bishop's neck injury was caused by the box falling on her head as she was "bent forward looking down," necessitating spinal fusion surgery in her neck. Dr. Stanley provided a detailed medical explanation of how a

box striking a person's head in that position could cause severe neck trauma and injury, stating "[t]hat's the absolute worst biomechanical position for your neck to be in." Although Dr. Peeples testified that Bishop's injury was age-related and not caused by the box falling on her head, it was the role of the jury to assess witness credibility and weigh contradictory evidence.

Based upon Dr. Stanley's testimony, Bishop's medical records and testimony, Walmart's records of the accident, and the temporal proximity between the accident and Bishop's immediate neck pain and multiple visits to the urgent care facility, physicians, and other health-care providers, there existed more than a scintilla of evidence from which the jury could reasonably infer that Bishop's neck injury was proximately caused by the box falling on her head while she was looking down. *See Guevara v. Ferrer*, 247 S.W.3d 662, 666–68 (Tex. 2007) ("[W]hen combined with other causation evidence, evidence that conditions exhibited themselves or were diagnosed shortly after an event may be probative in determining causation."). Thus, the evidence was legally sufficient to support the jury's proximate cause finding. *King Ranch*, 118 S.W.3d at 751. Further, the issue of proximate cause is one of fact for determination by the jury, and the jury's finding that Bishop's neck injury was proximately caused by the box striking her head while she was looking down was not so against the great weight and preponderance of the evidence that it is clearly wrong, manifestly unjust, or shocks the conscience. *Golden Eagle Archery*, 116 S.W.3d at 761. Therefore, we conclude the evidence was factually sufficient to support the jury's proximate cause finding.

We resolve Walmart's second issue against it.

### Damage Awards

In its fifth issue, Walmart complains the evidence is factually insufficient to support the jury's damage award for physical pain, legally and factually insufficient to support the jury's damage award for mental anguish, and factually insufficient to support the jury's damage award

for physical impairment.[6]  With respect to the jury's damage award for physical pain, Walmart simply states in its appellate brief that the evidence must be sufficient to show Bishop's pain was caused by the box falling on her head rather than from a prior surgery on the lumbar region of her spine.  Other than offering that single statement, Walmart does not provide substantive analysis of its factual sufficiency issue, nor does it provide citations to applicable law.  We therefore question whether Walmart has presented anything for our review; an appellant's failure to cite legal authority or provide substantive analysis of a legal issue results in waiver of the complaint. *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (observing that error may be waived by inadequate briefing).  With regard to the jury's damage award for mental anguish, Walmart argues Bishop's testimony was generalized and conclusory, and not direct evidence of the nature, duration, or severity of Bishop's mental anguish.  Finally, concerning the jury's damage award for physical impairment, Walmart argues Bishop failed to produce sufficient evidence of those tasks or activities she can no longer perform, or a loss of the enjoyment of life separate and apart from pain and suffering.

"The process of awarding damages for amorphous, discretionary injuries such as mental anguish or pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Figueroa v. Davis*, 318 S.W.3d 53, 62 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (internal citation omitted).  The amount of damages awarded for pain and suffering is necessarily speculative and each case must be judged on its own facts. *Id.* at 62. Physical pain and suffering may be established through a plaintiff's testimony or other evidence, including circumstantial evidence. *Ten Hagen Excavating, Inc. v. Castro-Lopez*, 503 S.W.3d 463, 487 (Tex. App.—Dallas 2016, pet. denied); *Christian Care Ctrs. v. O'Banion*, No. 05-12-01407-

---

[6] The jury awarded damages in the following amounts:  $150,000 for physical pain and mental anguish sustained in the past; $125,000 for physical pain and mental anguish that, in reasonable probability, Bishop will sustain in the future; $175,000 for physical impairment sustained in the past; $250,000 for physical impairment that, in reasonable probability, Bishop will sustain in the future; and $693,484.52 for reasonable expenses of necessary medical care incurred in the past.

CV, 2015 WL 5013615, at *4 (Tex. App.—Dallas Aug. 25, 2015, no pet.) (mem. op.); *HCRA of Tex.*, 178 S.W.3d 861, 871 (Tex. App.—Fort Worth 2005, no pet.). If there is no direct evidence of pain, the jury is permitted to infer the occurrence of pain from the nature of the injury. *Ten Hagen Excavating*, 503 S.W.3d at 487.

Generally, an award of mental anguish damages must be supported by direct evidence that the nature, duration, and severity of mental anguish was sufficient to cause, and caused, either a substantial disruption in the plaintiff's daily routine, or a high degree of mental pain and distress. *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011); *see also HCRA of Tex.*, 178 S.W.3d at 871 ("The duration of the pain and mental anguish is an important consideration."). There must be evidence of the existence of mental anguish, and some evidence to justify the amount awarded. *HCRA of Tex.*, 178 S.W.3d at 871.

Physical impairment is a distinct injury from pain and suffering and includes limitations on physical activities. *See Estrada v. Dillon*, 44 S.W.3d 558, 561–62 (Tex. 2001). "Physical impairment is an element of damages that extends beyond loss of earning capacity and beyond any pain and suffering, to the extent that it produces a separate loss that is substantial or extremely disabling." *Day v. Domin*, No. 05-14-00467-CV, 2015 WL 1743153, at *4 (Tex. App.—Dallas Apr. 16, 2015, no pet.) (mem. op.) (quoting *Dawson v. Briggs*, 107 S.W.3d 739, 752 (Tex. App.—Fort Worth 2003, no pet.)); see also *Allen v. Whisenhunt*, 603 S.W.2d 242, 244 (Tex. Civ. App.—Houston [14th Dist.] 1980, writ dism'd w.o.j.) (to recover damages for future physical impairment, one must have proof of physical impairment extending beyond impediment to earning capacity and pain and suffering, and producing a substantial, distinctly separate loss). "Evidence of physical impairment may include proof of the need for physical therapy and the inability to participate in physical activities engaged in before the accident." *Pierre v. Swearingen*, 331 S.W.3d 150, 156 (Tex. App.—Dallas 2011, no pet.) (citing *Estrada*, 44 S.W.3d at 561–62).

Evidence of difficulty accomplishing tasks may support an award for physical impairment damages. *Day*, 2015 WL 1743153, at *4.

Once the existence of some pain, suffering, and mental anguish has been established, "[a] great deal of discretion is given to the jury in awarding an amount of damages it deems appropriate for pain and suffering." *Christian Care Ctrs.*, 2015 WL 5013615, at *4; *PNS Stores v. Munguia*, 484 S.W.3d 503, 517–18 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("In personal injury cases, the jury has discretion over the amount of damages."); *HCRA of Tex.*, 178 S.W.3d at 871. The amount awarded is left to the discretion of the factfinder, because there is no objective way to measure the adequacy of damages. *Figueroa*, 318 S.W.3d at 62–63. "Because jurors are the sole judges of the credibility of witnesses and may choose to believe one witness and disbelieve another, we must not substitute our opinion for that of the jury." *PNS Stores*, 484 S.W.3d at 510.

The evidence at trial established that Bishop was prescribed no fewer than four rounds of physical therapy beginning immediately after the box fell on her head, and continues to require ongoing physical therapy; visited numerous physicians and other health-care providers; and underwent numerous medical treatments, including a cervical fusion surgery resulting in the placement of two cages, a plate, and six screws in her neck. At trial, Bishop testified that almost four years after the accident, she is still in pain. She continues to experience pain across her neck and shoulders, and throbbing in her eyes. She cannot engage in every-day activities as simple as turning her neck while driving, showering, sitting at her computer for work, or leaning over the sink while brushing her teeth without pain. The evidence showed Bishop's injury now limits her mobility, thereby preventing her from living her life as she did before the box fell on her head. She no longer is able to spend time with her children and grandchildren, host dinners at her house, sew, travel, and attend church activities as she did before the accident, and is generally less active, mentally alert, and creative. She frequently leaves work and goes directly to bed. Bishop testified

she has lost the control she previously had over her life because of the pain, stating, "[Before the injury] I felt like I was in total control. I'm not anymore. The pain controls me." The record reflects that prior to the box falling on her head, Bishop never complained about neck pain, including after undergoing back surgery in 2010.

Even if Walmart has not waived its argument that the evidence is factually insufficient to support the jury's damage award for physical pain, we conclude on this record that the evidence of physical pain was not so weak that it can be said the jury's award was clearly wrong, manifestly unjust, or shocks the conscience. *PNS Stores*, 484 S.W.3d at 518 (headaches, ringing in ears, severe pain in eye upon exposure to light, and soreness and stiffness in neck and shoulder for over two years constitutes factually sufficient evidence to support damage award for physical pain). Similarly, there is more than a scintilla of evidence supporting the jury's damage award for mental anguish and the evidence was not so weak that it can be said the jury's award was clearly wrong, manifestly unjust, or shocks the conscience. *Id.* (evidence of inability to shake off negative feelings, inability to feel upbeat and happy, and "heart [no longer] in anything" constitutes factually sufficient evidence to support mental anguish award). Finally, on this record the evidence of physical impairment was not so weak that it can be said the jury's award was clearly wrong, manifestly unjust, or shocks the conscience. *See Pierre*, 331 S.W.3d at 156 (concluding evidence plaintiff spent three months in physical therapy and sustained loss of full range of motion in neck due to pain, limiting ability to drive and transport grandchildren, was legally and factually sufficient to support physical impairment damage award); *Day*, 2015 WL 1743153, at *4.

We resolve Walmart's fifth issue against it.

### *Admission of Evidence*

In a sub-issue of its second issue, Walmart complains the trial court abused its discretion in allowing Dr. Stanley to testify because Dr. Stanley was not adequately disclosed or a proper

rebuttal witness. The discovery rule requiring disclosure of experts before trial is intended to provide adequate information about the experts' opinions to allow the opposing party to prepare to cross-examine the experts and rebut the testimony with their own experts. *Exxon Corp. v. W. Tex. Gathering Co.*, 868 S.W.2d 299, 304 (Tex. 1993); *Taylor Foundry Co. v. Wichita Falls Grain Co.*, 51 S.W.3d 766, 773 (Tex. App.—Fort Worth 2001, no pet.); *see also* TEX. R. CIV. P. 194.2.

"The trial court is the gatekeeper of expert evidence, and [appellate courts] may not usurp that responsibility." *Taylor Foundry Co.*, 51 S.W.3d at 773. We review the trial court's decision to allow expert testimony under an abuse of discretion standard. *E.I. du Point de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles," *id.*, "not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action." *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985). The appellate court must determine only whether allowing the testimony was "arbitrary or unreasonable." *Id.* at 242. "We must uphold a trial court's evidentiary ruling if there is any legitimate basis in the record to support it." *Rogers v. Alexander*, 244 S.W.3d 370, 383 (Tex. App.—Dallas 2007, no pet.).

The record shows Bishop timely designated Dr. Stanley as a non-retained testifying expert, but did not call on him to testify as part of her case in chief. Rather, Bishop called Dr. Stanley to testify as a rebuttal witness concerning the testimony of Walmart's testifying expert, Dr. Peeples, that Bishop's "pain and resultant medical care and medical treatment" were the result of the degeneration of her cervical spine. In a hearing conducted outside of the presence of the jury, the trial court reviewed Dr. Peeples's report, and determined it did not state whether Bishop's neck injury was caused by the box striking Bishop's head or a "pre-existing degenerative condition in

her neck." On that basis, the trial court allowed Dr. Stanley to testify as a rebuttal witness on the issue of causation.[7] The trial court stated:

> . . . I agree with [Bishop that the report did not address causation] because I can't discern from what . . . Defense counsel gave me as to . . . causation . . . . [B]asically [Peeples] was just negating some of the medical records, but he never actually stated that . . . [Bishop's] injury was not caused by the falling of the [box].

The trial court specifically limited the scope of Dr. Stanley's testimony to the issues of causation and cervical degeneration. After considering the foregoing, we cannot conclude the trial court abused its discretion by allowing Dr. Stanley's rebuttal testimony. We resolve the sub-issue of Walmart's second issue against it.

In its third issue, Walmart contends the trial court abused its discretion by denying Walmart's Motion for Leave to File Counteraffidavits under Texas Civil Practice and Remedies Code Section 18.001, and not allowing Walmart to present at trial the expert testimony of Dr. Brent Morgan on the reasonableness and necessity of Bishop's medical expenses. Bishop moved to exclude Dr. Morgan as an expert witness on the ground that Walmart did not attempt to file a section 18.001 counteraffidavit until late January 2016, long after the statutory deadline had passed, even though Bishop timely began filing section 18.001 affidavits more than a year prior, in early January 2015. Walmart argues the trial court, as a matter of fairness, should have permitted Walmart to file a counteraffidavit by Dr. Morgan under section 18.001(e)(1), since it allowed Bishop to challenge Walmart's designation of Dr. Morgan as an expert witness thirteen days after

---

[7] At the hearing, Walmart's counsel tendered Dr. Peeples' report to the court reporter as Defendant's Exhibit B for inclusion in the record but not for submission to the jury. While Defendant's Exhibit B does not appear to be included in the record on appeal, it is not necessary to our analysis of this issue since the hearing was recorded in the trial transcript which is included in the appellate record and Walmart does not challenge the trial court's characterization of the content of Dr. Peeples' report.

the deadline set forth in the agreed scheduling order.[8]  Bishop responds that when Walmart did not timely file section 18.001 counteraffidavits, and did not seek leave to late-file counteraffidavits for more than a year after she began filing section 18.001 affidavits, she "had every reason to believe that [she] would not be required to arrange – and pay – for all of her treating physicians to testify live at trial," and it was not feasible to do so ten weeks before trial.

In a personal injury case, a claim for past medical expenses must be supported by evidence that (1) the plaintiff's injury was caused by the defendant's negligence, and (2) the medical treatment was necessary and the charges for that treatment were reasonable.  *See Ten Hagen Excavating*, 503 S.W.3d at 490–91.  A plaintiff may present evidence concerning the reasonableness and necessity of past medical expenses through expert testimony at trial or an affidavit from the plaintiff's health-care provider made in compliance with section 18.001 of the civil practice and remedies code.  *Id.*  An opposing party intending to controvert a claim in a medical expense affidavit must serve a counteraffidavit within the parameters prescribed in section 18.001.  *See id.* at 492; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 18.001(e)–(f) (West 2015).

In pertinent part, section 18.001 provides,

(b) Unless a controverting affidavit is served as provided by this section, an affidavit that the amount a person charged for a service was reasonable at the time and place that the service was provided and that the service was necessary is sufficient evidence to support a finding of fact by judge or jury that the amount charged was reasonable or that the service was necessary.

. . . .

(e) A party intending to controvert a claim reflected by the affidavit must serve a copy of the counteraffidavit on each other party or the party's attorney of record:

[8] On appeal, Walmart also complains the trial court changed its position on allowing Bishop to challenge Walmart's designation of Dr. Morgan as an expert witness after the scheduling order deadline.  Walmart argues that at a pre-trial hearing on February 22, 2016, the trial court stated any challenges to expert testimony it had not already ruled on were deemed to be waived, including Bishop's motion to exclude Dr. Morgan as an expert witness; then, at a subsequent pre-trial hearing on February 26, 2016, the trial court allowed Bishop to challenge, pursuant to section 18.001, Walmart's motion for leave to file a counteraffidavit by Dr. Morgan.  However, the trial court has wide discretion to enforce a scheduling order and manage its docket, *see Bagwell v. Ridge at Alta Vista Investment, I, LLC*, 440 S.W.3d 287, 292 (Tex. App.—Dallas 2014, pet. denied), and the trial court explicitly stated its decision on Walmart's motion for leave to file counteraffidavit was based on the "clear" requirements of section 18.001.

(1) not later than:

(A) 30 days after the party receives a copy of the affidavit; and

(B) at least 14 days before the day on which evidence is first presented at the trial of the case; or

(C) with leave of the court, at any time before the commencement of evidence at trial.

TEX. CIV. PRAC. & REM. CODE ANN. § 18.001(b), (e). "Section 18.001 is an evidentiary statute that accomplishes three things: (1) it allows for the admissibility, by affidavit, of evidence of the reasonableness and necessity of charges that would otherwise be inadmissible hearsay; (2) it permits the use of otherwise inadmissible hearsay to support findings of fact by the trier of fact; and (3) *it provides for exclusion of evidence to the contrary*, upon proper objection, in the absence of a properly-filed controverting affidavit." *Hong v. Bennett*, 209 S.W.3d 795, 800 (Tex. App.—Fort Worth 2006, no pet.) (emphasis added).

Unless a controverting affidavit is served as provided by section 18.001, the initial affidavit is sufficient evidence to support a jury's finding that past medical expenses were reasonable and necessary. *Liang v. Edwards*, No. 05-15-01038-CV, 2016 WL 7163841, at *2 (Tex. App.—Dallas Nov. 23, 2016, no pet.) (mem. op.) ("The jury is not required to award a plaintiff the amount of damages established in the affidavit, but if it chooses to do so, the affidavit is sufficient evidence to support the jury's finding that past medical expenses were reasonable and necessary."). By filing a counteraffidavit compliant with section 18.001, the defendant can preclude the plaintiff's affidavit from being used as evidence of the reasonableness and necessity of medical expenses, and instead require the plaintiff to prove reasonableness and necessity by expert testimony at trial. *Liang*, 2016 WL 7163841, at *2; *see also Rountree v. Cavazos*, No. 05-16-00512-CV, 2017 WL 2730422, at *1 (Tex. App.—Dallas June 26, 2017, no pet.) (mem. op.) (medical provider's section 18.001 affidavit saves plaintiff expense of hiring expert to testify medical expenses were reasonable and necessary). Among other requirements, the defendant must file and serve a copy

–25–

of the counteraffidavit not later than thirty days after receipt of the initial affidavit and at least fourteen days before the day on which evidence is first presented at trial, or with leave of court at any time before commencement of evidence at trial. TEX. CIV. PRAC. & REM. CODE ANN. §18.001(e)(1). Because section 18.001 is an evidentiary statute, we review the trial court's ruling on the admission or exclusion of a section 18.001 affidavit under an abuse of discretion standard. *Liang*, 2016 WL 7163841, at \*2. We must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling. *Id.*

Bishop began filing section 18.001 affidavits pertaining to the reasonableness and necessity of past medical expenses in January of 2015, and continued to do so until October of 2015. In March of 2015, Walmart timely designated Dr. Morgan as a testifying expert witness and provided Bishop with a copy of Dr. Morgan's expert report. Walmart, however, failed to timely serve or file a controverting affidavit of Dr. Morgan under section 18.001. As relevant to this appeal, on January 25, 2016, Bishop filed a motion to exclude Dr. Morgan's testimony on the issue of the reasonableness and necessity of Bishop's past medical expenses on the basis that Walmart failed to timely file a section 18.001 controverting counteraffidavit. On January 29, 2016, Walmart filed a motion for leave to file a counteraffidavit and response to Bishop's motion to preclude Dr. Morgan from testifying at trial. The trial court denied Walmart's motion for leave to file counteraffidavit, and the trial transcript reflects that Dr. Morgan did not testify at trial.

Walmart argues the trial court erred by excluding the controverting counteraffidavit of Dr. Morgan and not permitting him to testify at trial regarding the reasonableness and necessity of Bishop's past medical expenses, because the timely designation or Dr. Morgan as a testifying witness provided notice that Walmart had engaged a testifying witness on that issue. However, "[o]ne of the purposes of a section 18.001 affidavit is that it 'provides for exclusion of evidence to the contrary, upon proper objection, in the absence of a properly-filed counteraffidavit.'" *Ten*

*Hagen Excavating, Inc.*, 503 S.W.3d at 494 (internal citation omitted). Allowing Dr. Morgan to testify would have undermined a purpose of the statute, which is to spare Bishop the expense of hiring an expert witness to testify at trial if the issue of the reasonableness and necessity of medical expenses has not been joined by Walmart's filing of a counteraffidavit. *See id.* at 491, 494 ("in the absence of a proper counteraffidavit, we cannot say that the trial court abused its discretion when it excluded [doctor's] trial testimony controverting the [plaintiffs'] section 18.001 affidavits"); *see also Rountree*, 2017 WL 2730422, at *1.

Timely filing of a section 18.001 affidavit is a condition precedent to its admission. *See Bituminous Cas. Corp. v. Cleveland*, 223 S.W.3d 485, 493 (Tex. App.—Amarillo 2006, no pet.). It is undisputed that Bishop timely filed section 18.001 affidavits. Walmart had sufficient notice of the need to timely file a section 18.001 counteraffidavit, however it did not attempt to file a counteraffidavit until long after the statutory deadline had passed. We conclude there was a legitimate basis for the trial court to deny Walmart's request for leave to late-file a counteraffidavit, and, therefore, the court did not abuse its discretion in denying that request and declining to permit Dr. Morgan to testify at trial.

We conclude the trial court did not act without reference to guiding rules or principles, and there was a legitimate basis for its evidentiary rulings. Since the court did not abuse its discretion, we resolve Walmart's third issue against it.

### Jury Charge Error

In its fourth issue, Walmart argues the trial court committed harmful error by failing to limit the scope of Question 1 of the jury charge, and the related definitions of "negligence" and "ordinary care," to a theory of liability based solely on the conduct of Gajurel. Walmart does not contend the trial court's definitions or instructions misstated the law. Rather, Walmart claims the instructions were ambiguous, and confused the jury by failing to include Gajurel's name in the

definitions of "negligence" and "ordinary care," and "advise jurors [in Question 1] that Wal-Mart was negligent *only if* Gajurel was negligent."

Trial courts have broad discretion in formulating a charge to submit disputed issues to the jury. *Varme v. Gordon*, 881 S.W.2d 877, 881 (Tex. App.—Houston [14th Dist.] 1994, writ denied). The standard of review for jury charge error is abuse of discretion. *Webb v. Glenbrook Owners Ass'n. Inc.*, 298 S.W.3d 374, 380 (Tex. App.—Dallas 2009, no pet.) ("We review claimed error in the court's charge under an abuse of discretion standard."). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner, or if it acts without reference to guiding rules or principles. *Downer*, 701 S.W.2d at 241–42. To determine whether an alleged error in the jury charge is reversible, we must consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986). We do not reverse for jury charge error in the absence of harm. *See Lone Star Gas Co. v. Lemond*, 897 S.W.2d 755, 756–57 (Tex. 1995) (per curiam). For harm to result, the error must probably cause the rendition of an improper judgment. TEX. R. APP. P. 44.1(a)(1); *Friday v. Spears*, 975 S.W.2d 699, 700 (Tex. App.—Texarkana 1998, no pet.) ("Error in the jury charge is reversible only if it probably caused the rendition of an improper verdict.").

The rules of civil procedure require the trial court to submit the cause upon broad form questions when feasible, and to submit such instructions and definitions as shall be proper to enable the jury to render a verdict. TEX. R. CIV. P. 277. A proper instruction is one that assists the jury, correctly states the law, and is supported by the pleadings and evidence. *Latham v. Burgher*, 320 S.W.3d 602, 606 (Tex. App.—Dallas 2010, no pet.). The trial court has broad discretion in submitting explanatory instructions and definitions as long as the charge is legally correct. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999). After the jury has retired for deliberations, the trial court may supplement its instructions "touching any matter of law." *See*

TEX. R. CIV. P. 286.  The trial court may also supplement its instructions in response to a question from the jury during deliberations.  *See id.*

To preserve error in the charge, the objecting party must present a complaint to the trial court that distinctly designates the error and grounds for the objection.  *See* TEX. R. APP. P. 33.1(a); TEX. R. CIV. P. 272, 274; *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007).  Any complaint pertaining to an instruction is waived unless specifically included in the objection. *Sears, Roebuck & Co. v. Abell*, 157 S.W.3d 886, 891 (Tex. App.—El Paso 2005, pet denied). Objections to the charge and requests for instructions must comport with the arguments made on appeal.  *Cont'l Cas. Co. v. Baker*, 355 S.W.3d 375, 383 (Tex. App.—Houston [1st Dist.] 2011, no pet.).  If the objection at trial is not the same as the complaint on appeal, the issue has not been preserved for review.  *Id*.

As discussed, *supra*, a single liability question was presented to the jury:

QUESTION 1

Did the negligence, if any, of Wal-Mart, proximately cause the occurrence in question:

Wal-Mart was negligent if Bhola Gajurel was negligent while acting within the course and scope of his employment.

Answer "Yes" or "No"

Answer: _____

The jury answered "Yes."  There is no dispute the trial court defined "negligence" and "ordinary care" in accordance with the Texas Pattern Jury Charges.  Question 1 instructed the jury concerning the single means by which Walmart could be found liable for negligence, "Wal-Mart was negligent *if Bhola Gajurel was negligent while acting within the course and scope of his employment*" (emphasis added).  The single liability question, which incorporated the term "negligence" as defined by the charge, is explicitly limited to the acts of Gajurel within the course and scope of his employment.  On this record, we cannot conclude the definitions of "negligence" and "ordinary

–29–

care," which are taken directly from the Texas Pattern Jury Charges, are so ambiguous that the jury would have been confused as to the meaning of the liability question or the basis of Walmart's alleged negligence.

At the charge conference, Walmart proposed the following language for inclusion in the jury instructions: "Wal-Mart was negligent if Bhola Gajurel was negligent while acting within the course and scope of his employment." In support of this proposed instruction, Walmart argued that only Gajurel's "conduct" should be at issue in Question 1, stating to the court, "for Question 1, [the jury is] supposed to look at the world of Mr. Bhola" and that the instruction should not include language regarding "the way [Walmart] handled hiring and retaining or supervising or training [Gajurel]." The trial court overruled an objection by Bishop, and submitted Walmart's proposed language to the jury.[9] Walmart cannot now complain that Question 1 "*did not* advise jurors that Wal-Mart was negligent *only if* Gajurel was negligent." *See id.*; *C.M. Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768, 785 (Tex. App.—Houston [1st Dist.] 2004, no pet.) ("a party waives claimed error in the charge when that party proposes to submit a substantially similar charge to the jury"). *See also* TEX. R. APP. P. 33.1; TEX. R. CIV. P. 272, 274*; Ledesma*, 242 S.W.3d at 43. Even if the asserted error had not been waived, Question 1 required the jury to determine whether Gajurel "was negligent while acting within the course and scope of his employment." Only Gajurel's actions and conduct are addressed and at issue in Question 1, and the question properly

---

[9] In a post-submission filing, Walmart directed our attention to the Supreme Court's opinion in *Benge v. Williams*, No. 14-1057, –S.W.3d–, 2018 WL 2374640 (Tex. May 25, 2018). *Benge* involved a health care liability claim in which the evidence showed multiple possible bases for the defendant's negligence, including a basis not asserted by the plaintiff. The defendant requested the jury be instructed that it could not consider the basis not asserted by the plaintiff. The trial court refused the requested instruction. The Supreme Court concluded on appeal that because it could not determine whether the jury found liability on an improper basis, it was required to presume the error in denying the limiting instruction was harmful. *Benge* does not impact our analysis because Walmart received the instruction it requested.

–30–

provided only one theory – Gajurel's actions and conduct – upon which Walmart could be found negligent.[10]

We find no abuse of discretion in the trial court's instructions to the jury in Question 1 and related definitions, and resolve Walmart's fourth issue against it.

### *Jury Argument*

In its sixth issue, Walmart complains the judgment should be reversed because the trial court allowed Bishop's trial counsel, Daryoush Toofanian, to make improper jury arguments that discussed theories of liability not submitted to the jury; characterized Walmart in a manner intended to inflame the passion of the jury; misled the jury as to the reason Walmart did not present evidence on the reasonableness and necessity of Bishop's past medical expenses; and characterized conflicting sworn statements by Gajurel as constituting "perjury."

Control over counsel during closing argument is within the sound discretion of the trial court and will not be disturbed on appeal without a clear showing of abuse of that discretion. *Duke v. Jack in the Box E. Div., L.P.*, No. 14-15-00798-CV, 2017 WL 2561245, at \*2 (Tex. App.—Houston [14th Dist.] June 13, 2017, pet. denied) (mem. op.); *Mandril v. Kasishke*, 620 S.W.2d 238, 247 (Tex. App.—Amarillo 1981, writ ref'd n.r.e.).[11] Improper jury argument can be 'curable' or 'incurable.' *See PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 721 (Tex. App.—Dallas 2011, pet. denied). A jury argument is curable when the harmful effect of the argument could be eliminated by a trial judge's instruction to the jury to disregard the improper argument. *Living Ctrs. of Tex.*, 256 S.W.3d at 680–81; *Otis Elevator Co. v. Wood,* 436 S.W.2d

---

[10]   Walmart points to a jury note sent to the trial court during deliberations inquiring whether Walmart was negligent only if Gajurel was negligent, in support of its argument that Question 1 permitted a determination Walmart was negligent for some act independent of the conduct of Gajurel. After receiving the note from the jury, the trial court indicated to the parties that it intended to direct the jury to read and follow the charge as written. Walmart responded "No objection. I think we might get the question again, but that's fine." The trial court then responded to the jury note by directing the jury to follow the charge as written. Because Walmart accepted and did not object to the court's response, it waived any error on that basis. *Tensor*, 135 S.W.3d at 785.

[11] *See also Rothenberg v. Tucker*, No. 05-92-00558-CV, 1993 WL 155878, at \*8 (Tex. App.—Dallas May 10, 1993, no writ) (not designated for publication) (citing *id.*) ("Control over counsel during a trial rests within the sound discretion of the trial court, and it is uniformly held that a reviewing court will not interfere unless it is clear that the trial court abused its discretion in this regard.").

324, 333 (Tex. 1968); *PopCap Games*, 350 S.W.3d at 721; *Clark v. Bres*, 217 S.W.3d 501, 509 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). To preserve error on a jury argument that is improper but curable, the objecting party must, at the time the argument occurs, promptly object, obtain a ruling on its objection, and, if the objection is sustained, request an instruction that the jury disregard the improper remark. *See Living Cntrs. of Texas, Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008) (per curiam) ("Error as to improper jury argument must ordinarily be preserved by a timely objection which is overruled."); *PopCap Games*, 350 S.W.3d at 721 (to prevail on claim concerning improper jury argument, appellant must prove: (1) improper jury argument was made; (2) that was not invited or provoked; (3) that was preserved by proper objection or other predicate; and (4) that was not curable by instruction, prompt withdrawal of statement, or reprimand by court).

In rare cases, an improper argument is considered incurable, and a contemporaneous objection is not required. *PopCap Games*, 350 S.W.3d at 721. A complaint of incurable jury argument may be asserted and preserved in a motion for new trial. *See* TEX. R. CIV. P. 324(b)(5); *Nguyen v. Myers*, 442 S.W.3d 434, 442 (Tex. App.—Dallas 2013, no pet.). An improper jury argument is incurable when it is so inflammatory and prejudicial that its harmfulness could not be eliminated by an instruction to the jury to disregard it. *Id.* "The party claiming incurable harm must persuade the court that, based on the record as a whole, the offensive argument was so extreme that a 'juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument.'" *Metrop. Transit Auth. v. McChristian*, 449 S.W.3d 846, 855 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (quoting *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009)). "Reversal of the judgment will follow where, after evaluation of the whole case, from voir dire to jury argument, it is shown that the probability that the improper argument caused harm is greater than the probability that the

verdict was grounded on the proper proceedings and evidence." *Williams v. Lavender*, 797 S.W.2d 410, 413 (Tex. App.—Fort Worth 1990, writ denied); *see also Khan v. Chai Road, Inc.*, No. 05-16-00346-CV, 2017 WL 3015727, at *2–3 (Tex. App.—Dallas July 17, 2017, no pet.) (mem. op.) (citing *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839—40 (Tex. 1979)). Incurable jury argument generally encompasses statements that "strike at the courts' impartiality, equality, and fairness" because they "inflict damage beyond the parties and the individual case under consideration if not corrected." *Living Ctrs. of Tex.,* 256 S.W.3d at 681. Instances of incurable jury argument include appeals to racial prejudice; unsupported charges of perjury; unsupported, extreme, and personal attacks on opposing parties and witnesses; and baseless accusations of witness tampering. *Metrop. Transit Auth.*, 449 S.W.3d at 855. "There are only rare instances of incurable harm from improper argument." *Standard Fire Ins. Co.*, 584 S.W.2d at 839.

While Walmart did not preserve its improper jury argument claims by making contemporaneous objections and obtaining rulings on the record at trial, it filed a motion for new trial that, excepting its complaint that Toofanian characterized Gajurel's conflicting sworn statements as perjury, included its improper jury argument claims now asserted on appeal. We therefore must determine whether these closing arguments to the jury challenged in Walmart's motion for new trial constituted "rare" instances of arguments that "strik[e] at the appearance of and the actual impartiality, equality, and fairness of justice rendered by courts," causing incurable harm to the complaining party and judicial system. *See Living Ctrs. of Tex.,* 256 S.W.3d at 681.

Walmart first complains that although the trial court submitted a single theory of negligence to the jury based upon vicarious liability for the conduct of Gajuirel, Toofanian argued facts supporting premises liability and negligent training theories in closing argument. Specifically, Walmart complains of the following statements in Toofanian's closing argument:

"[T]here was no rhyme and no reason as to how this section was organized."

"We know that there was merchandise scattered on the floor."

"[Walmart] didn't tell us that it was a mess, so – you be the judge."

"Tell me if there's enough room between the shelves where somebody can . . . safely work back there."

"We know that he was not given any specific instruction on restocking the area where he was. We know that nobody advised him on the dangers of falling merchandise. . ."

"The fact is that Walmart refuses to admit that if they did not put a sick and undertrained working (sic) in that zone of danger, he would not have knocked that box off the shelf."

"Properly train your people. Don't send this kid back there who's sick, who – who doesn't know what he's doing in this war zone without the appropriate training."

"[H]e was very untrained."

Walmart does not contend these statements concerning Gajurel's work stocking and shelving items in the clearance section were unsupported by evidence presented at trial. Rather, Walmart argues these are "facts that have no bearing on the legal issue the jury [was] to decide," that is, whether Gajurel's negligence caused the box to fall. The complained of statements bear on the negligence of Gajurel; however, even if Toofanian's statements were improper, they did not rise to the level of incurable jury argument. They did not involve appeals to racial prejudice, extreme or personal attacks on the opposing party, or inflammatory epithets. Nor, "after evaluation of the whole case," is it probable that any alleged harm caused by the statements was "greater than the probability that the verdict was grounded on the proper proceedings and evidence." *Williams*, 797 S.W.2d at 413.

Next, Walmart complains that Toofanian's use of the term "Walmart treatment," referring to Walmart's witness as a "hit man," and characterization of Bishop as a "victim" were incurably inflammatory and prejudicial. Jury argument is designed to be persuasive and is not intrinsically improper as long as it is based on facts and issues raised by the evidence, and is not so inflammatory as to cause the rendition of an improper verdict. *See Standard Fire Ins.*, 584 S.W.2d

at 838. "Hyperbole is also generally a permissible rhetorical technique in closing argument." *PopCap Games*, 350 S.W.3d at 721. So long as the verdict was grounded on the record and evidence, argument designed to appeal to hatred or arouse sympathy for a party is not incurable. *See Standard Fire Ins.*, 584 S.W.3d at 839–40. To the extent these statements by Toofanian were improper, they were not so inflammatory and incurably harmful as to "strik[e] at the appearance of and the actual impartiality, equality, and fairness of justice rendered by courts," and did not constitute incurable jury argument. *Living Ctrs. Of Tex.*, 256 S.W.3d at 681; *see also Metro. Transit Auth.*, 449 S.W.3d at 855 (making reference to opposing counsel and asking "what kind of snake oil is he selling you" is not incurable jury argument).

Walmart also argues that Toofanian's statement to the jury that Walmart did not present evidence on the reasonableness and necessity of Bishop's medical expenses because "they know it's expensive" was false and severely prejudicial. Counsel must confine argument strictly to the evidence and to the arguments of opposing counsel. TEX. R. CIV. P. 269(e). Toofanian's misleading statement to the jury was improper because Walmart was precluded by the court from introducing evidence on the reasonableness and necessity of Bishop's medical expenses. However, the statement was not incurably harmful. In determining whether an improper argument caused harm, an appellate court must look at the length of the argument, whether it was repeated or abandoned, whether there was cumulative error, and the probable effect of the argument on a material finding. *Standard Fire Insurance Co.*, 584 S.W.2d at 839–40. Toofanian's improper statement concerning Walmart's failure to present evidence on the reasonableness and necessity of Bishop's medical costs was not incurable because the statement was short and not repeated. Additionally, even if Toofanian had not made the misleading statement, the only evidence before the jury on the reasonableness and necessity of medical expenses was Bishop's section 18.001 affidavits, and "[t]he jury is not required to award a plaintiff the amount of damages established in

–35–

the affidavit[s] . . . ." *Liang*, 2016 WL 7163841, at \*2. Thus, we cannot say the probability that the improper argument caused harm was greater than the probability that the verdict was grounded on the proper proceedings and evidence. *Haryanto v. Saeed*, 860 S.W.2d 913, 921 (Tex. App.—Houston [14th Dist.] 1993, writ denied).

Finally, Walmart complains of Toofanian's suggestion in closing arguments that Gajurel committed perjury when he stated twice in trial testimony that he did not know why the box fell from the shelf or see it fall, yet stated in his sworn discovery responses that he believed Bishop caused the box to fall by manipulating it. Walmart did not object to Toofanian's statement at trial or in its motion for new trial, and thereby waived any alleged error concerning improper argument. However, even if Walmart's objection had been preserved for appellate review, Toofanian's statement was not incurable jury argument. While unsupported accusations of perjury may constitute incurable jury argument, Toofanian's statements were not unsupported. Rather, the argument emanated directly from testimony and evidence presented at trial. Gajurel provided conflicting sworn statements on why the box fell, which were admitted as evidence for the jury's consideration. Gajurel's trial testimony confirmed that, a little more than a week prior to his testimony at trial, he provided the following information in response to Plaintiff's First Set of Interrogatories, and understood he signed the responses under oath and that he "[had] to tell the truth":

> Interrogatory No. 3: Please state those facts which you contend establish that the incident in question was caused solely and/or proximately by a new and independent cause, and described each such new and independent cause.
>
> . . . .
>
> First Supplemental Answer: Defendant believes plaintiff manipulated the shelved merchandise is (sic) such a way as to cause the merchandise to become unstable and fall.

–36–

At trial, however, Gajurel – the only other person in the clearance section at the time the box fell and hit Bishop on the head – provided the following testimony:

Q: Now isn't it true, Mr. Gajurel,that you didn't see what happened in this incident?

A: No, I didn't see. I came to know when she called me and showed this thing.

. . . .

Q: And you don't know how or why the box fell off the shelf?

A: She was the only person there, so I didn't see how that – that box fell.

Q: Okay. And it's your test – and you've testified in this case that you don't know how or why the box fell off the shelf?

A: Yes. . . . That's correct.

Toofanian argued that Gajurel's "story has changed significantly." Additionally, Toofanian's closing argument identified other conflicting trial testimony provided by Gajurel. Toofanian questioned how Gajurel could make an affirmative statement about Bishop's "position in the [clearance] section" while claiming "that his back was turned to Mrs. Bishop while he was in the clearance section." Toofanian's suggestion that Gajurel's conflicting statements regarding the cause of the box falling on Bishop's head constituted perjury was not unsupported, but was reasonably based on or may be inferred from the evidence produced at trial. It therefore did not constitute incurable jury argument. *See Duke*, 2017 WL 2561245, at *5–6.

We conclude Toofanian's jury arguments were not "so extreme that a 'juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument.'" *Phillips*, 288 S.W.3d at 883. We resolve Walmart's sixth issue against it.

–37–

We affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

160749F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

WAL-MART STORES TEXAS, LLC,
Appellant

No. 05-16-00749-CV     V.

DAWN BISHOP, Appellee

On Appeal from the 162nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-14-00763.
Opinion delivered by Justice Fillmore,
Justices Lang-Miers and Stoddart
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

It is **ORDERED** that appellee DAWN BISHOP recover her costs of this appeal from
appellant WAL-MART STORES TEXAS, LLC.

Judgment entered this 19th day of June, 2018.