**AFFIRMED in part; REVERSE and REMAND in part; and Opinion Filed August 30, 2023**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-00552-CV**

**EL PAISANO NORTHWEST HIGHWAY, INC.,**
**D/B/A TAQUERIA EL PAISANO, Appellant**
**V.**
**ELIZABETH MARTINEZ, Appellee**

**On Appeal from the 68th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-17249**

## MEMORANDUM OPINION

Before Justices Reichek and Goldstein[1]
Opinion by Justice Reichek

Elizabeth Martinez sued a restaurant, El Paisano Northwest Highway Inc., d/b/a Taqueria El Paisano, for personal injuries allegedly caused by the restaurant's security guard. After a bench trial, the trial court rendered judgment in Martinez's favor. In four issues in this appeal, El Paisano challenges the sufficiency of the evidence of causation, various damage elements, and its vicarious liability for the

---

[1] Justice David Schenck was a member of the panel at the time of oral argument, but did not participate in this opinion due to his retirement from the Court. *See* TEX. R. APP. P. 41.1(b).

actions of the security guard and contends the trial court abused its discretion in imposing discovery sanctions against it. For reasons that follow, we affirm the part of the trial court's judgment that imposes monetary sanctions against El Paisano. Because testimony from a medical expert was necessary to establish a causal link between some of Martinez's injuries and the incident at the restaurant, we reverse the remainder of the judgment and remand for new trial.

### FACTUAL AND PROCEDURAL BACKGROUND

Late on the night of August 18, 2017, Martinez and her two adult daughters dined at El Paisano. Two armed security guards were on duty, Frankarlos "Frank" Tovar and Anna Obregon. The guards were there in part because on the weekend, many drunk customers came to the restaurant late at night after visiting nightclubs and bars. Martinez and her daughters ordered tortillas that arrived after they were finished eating. Martinez asked the cashier, who was also the manager on duty, to remove the $2.50 charge for the tortillas from the bill. According to Martinez, the manager argued with her and directed Tovar to remove her from the restaurant. After forcefully taking Martinez outside, Tovar placed her in a chokehold, "body slammed her" onto the concrete, and handcuffed her. An ambulance was called, and Martinez was taken to the hospital.

Martinez filed her original petition against El Paisano in December 2017, and later amended her pleadings to add Tovar and a security company, 250LB LLC d/b/a Delta Security Solutions ("Delta"), as defendants. Martinez alleged Tovar was a

Delta employee, but later voluntarily dismissed her claims against Delta. In her live pleading, Martinez alleged Tovar was an El Paisano employee and was not registered with any security company, in violation of the Private Security Act. *See* TEX. OCC. CODE ANN. §§ 1702.001–.389. She asserted claims against both El Paisano and Tovar for assault and battery, intentional infliction of emotional distress, and false imprisonment. She alleged the restaurant was vicariously liable for the actions of the security guards. Martinez also alleged El Paisano was negligent in numerous ways, including in failing to implement and maintain adequate procedures for expelling patrons and using force and in hiring and training the guards. In addition, Martinez alleged El Paisano was grossly negligent and that its employment of the guards in violation of the Private Security Act was negligence per se.

Tovar was served, but did not answer. El Paisano answered and later amended its answer to assert various affirmative defenses, among them that the restaurant was not responsible for the acts of Tovar because he was an independent contractor, not a restaurant employee. El Paisano also alleged Delta's negligence in hiring, training, and supervising Tovar was the proximate cause of Martinez's injuries. El Paisano moved to designate Delta as a responsible third party, and the trial court granted the motion.

During discovery, Martinez had difficulty getting information from El Paisano about the identities of key restaurant staff. She filed four motions to compel discovery and/or for discovery sanctions. First, on April 17, 2018, Martinez moved

–3–

to compel discovery because El Paisano failed to answer disclosures. The restaurant then answered the disclosures, but failed to identify Vicki Salazar, believed to be the restaurant manager on the date of the incident. Next, on June 28, 2019, Martinez filed a second motion to compel. El Paisano admitted it employed a security company, which employed Tovar. But according to Martinez, El Paisano had not been forthcoming about the name of the security company and the nature of the restaurant's relationship with Tovar. She also alleged El Paisano had agreed to produce its security contracts, but later claimed there were no written contracts. She sought sanctions.

Martinez's first two motions to compel are not part of the appellate record. But the allegations in those motions are repeated and incorporated in her two subsequent motions to compel. It appears from the docket sheet that the trial court did not rule on the first two motions.

On February 20, 2020, Martinez filed her Third Motion for Sanctions in which she alleged El Paisano's repeated abuses of the discovery process prevented her from discovering the extent of the control restaurant employees had over the security guards. In video depositions, El Paisano's designated corporate representative, Diana Alvarez Murillo, and its owner, Gricelda Ramirez, both identified Vicky Salazar as the restaurant manager on the night in question. Neither Murillo nor Ramirez could provide any contact information for Salazar, and El Paisano did not name Salazar in answer to disclosures.

–4–

The trial court granted Martinez's motion and ordered El Paisano to provide the names and last-known contact information for all staff, employees, managers, and contractors working on the night of the incident, including but not limited to Salazar. It also ordered El Paisano to produce payroll forms for those people and copies of El Paisano's recent insurance policies. The court ordered El Paisano to pay for all costs of locating, subpoenaing, and deposing Salazar.

In October 2020, Martinez filed a Fourth Motion for Sanctions. By that time, Salazar had been deposed, but Martinez learned Salazar was not the restaurant manager; she worked at another El Paisano location that was right next door to the location where Martinez was injured. In addition, El Paisano brought a lawsuit against Salazar, yet had previously claimed to not know how to find her. Martinez was informed the restaurant manager was Dora Figueroa. El Paisano never disclosed Figueroa in discovery. Martinez sought death penalty sanctions, arguing that El Paisano's conduct warranted a presumption that its defenses lacked merit.

The trial court heard Martinez's motion pretrial on the day the trial began, December 8, 2020. The court agreed with Martinez that El Paisano had abused the discovery process and imposed sanctions. It struck El Paisano's designation of Delta as a responsible third party and ordered El Paisano to pay $5,600 in attorney's fees

and reimburse Martinez for expenses incurred for the depositions of Murillo and Ramirez.[2]

Martinez called four live witnesses at trial—herself, her two daughters, and Delta's owner. Martinez also presented the video depositions of Murillo, Ramirez, and Salazar. Tovar was the sole witness for El Paisano.

Martinez and Tovar had significantly different accounts of what happened at the restaurant. Martinez, who was 45 years' old at the time of the incident and 5 feet tall, testified that when she disputed the charge for tortillas, the manager called the waitress over to discuss the issue, but there was a delay. Martinez asked the manager multiple times how much longer it would take. Martinez was well mannered, but the manager became belligerent. The manager told Martinez to "shut up bitch" and made a hand gesture to waive over Tovar. Tovar, a 260-pound man, walked up and bumped Martinez with his "big old chest, belly." He did not say anything to her. Martinez asked the manager again how much longer it would be to resolve the amount of her bill. At that point, the manager looked at Tovar and waived her finger at him. No words were exchanged. Tovar grabbed Martinez and dragged her out of the restaurant through the front door. He placed her in a chokehold, "body slammed her," punched her, and handcuffed her. Tovar yelled for the other security guard,

---

[2] Three days after it granted Martinez's Fourth Motion for Sanctions, the trial court signed an order denying the motion. There is no explanation for this order in the record. We presume it was a clerical error as the trial court later made findings of fact and conclusions of law that refer to the sanctions imposed.

Obregon, and she put Martinez in handcuffs. Obregon also pepper sprayed Martinez and her daughters. Martinez blacked out and did not know what happened after that. She was in and out of consciousness and vaguely remembered hearing voices and sirens. Her head, back, pelvis, shoulder, and arm all hurt.

An EMS report indicates Martinez became combative on the way to the hospital. She got off the stretcher, swung her hand at EMS staff, and threatened to jump out if not released. EMS pulled into a parking lot and let Martinez out. She told them she did not want to go to the hospital and signed a refusal. Dallas police officers arrived and took Martinez to Parkland Hospital.

Martinez was at the hospital for several hours. Parkland records indicate her chief complaint was shoulder pain. She also complained of pelvic and back pain and exhibited tenderness. Her eyes were red and watery, and she smelled of alcohol. An X-ray of Martinez's pelvis was performed. No fracture was detected. Martinez testified she was still in a lot of pain when she was released from the hospital.

Martinez testified about follow-up medical treatment for her injuries and how her injuries impacted her daily life and ability to work. She sought additional treatment from her primary care physician, a neurologist, and an orthopedist. The neurologist's notes from an August 31, 2017 visit state that Martinez had decreased concentration, attention, informational processing speed, recent memory, and reaction time. She was also easily confused. The doctor's impression was that Martinez had: a "concussion with loss of consciousness; post-concussive

syndrome;" spells of alteration of awareness and new onset hand jerking; "undefined posttraumatic dementia with behavior/cognitive dysfunctioning;" vertigo with imbalance; post-traumatic loss of taste and smell; and post-traumatic cervical and lumbar radiculopathy. At the time of trial, Martinez still suffered from pain in her head and pelvis and her senses of taste and sense of smell had not returned. She testified she had substantial memory loss which caused her to lose her job in January 2019 and caused the end of her twenty-five-year marriage.

Martinez had significant medical history both before and after the incident at El Paisano. Parkland records show that Martinez was diabetic and before the incident she suffered from migraine headaches and had a seizure disorder. On the night of the incident, she reported having a seizure nine days earlier. Less than a year before the incident, on October 30, 2016, Martinez broke her pelvis and injured her head when she fell out of a moving truck. She testified she recovered from those injuries, but still had some pain. There was also evidence that she suffered a stroke about nine months after the incident at El Paisano. Her medical records indicate she was hospitalized in May 2018 for a "CVA." Martinez testified she did not remember having a stroke.

Martinez's daughters Summer and Monique corroborated their mother's testimony about what happened at El Paisano and testified about changes they observed in their mother afterward. Summer saw Tovar slam her mother on the

ground forcefully and put his knee on Martinez's chest. Monique visited El Paisano in November 2018, and saw that Tovar was still working there.

Lucio Cano, Delta's owner and operator, testified that Tovar began working for Delta at the company's inception in 2014 as director of operations. On January 30, 2016, Delta entered into a contract with El Paisano for security guard services. Tovar obtained El Paisano's business and handled that contract for Delta. The contract provided that Delta would furnish two off-duty police officers to perform security services "in accordance with the client's preferences" between the hours of 11 p.m. and 4 a.m. on Fridays and Saturdays at an hourly rate of $45.

Cano testified that Tovar's employment with Delta was terminated prior to the Martinez incident, on May 1, 2017, because Tovar was taking security jobs at strip clubs, something Cano did not want to be involved in. According to Cano, Tovar's termination ended the contract between Delta and the restaurant. Delta issued a letter to its clients letting them know Tovar was no longer associated with the company. The letter, introduced into evidence, stated that no further business should be conducted with Tovar. Cano testified he hand delivered the letter to Ramirez, the owner of El Paisano. When Cano told her Tovar no longer worked for Delta, she did not care. Ramirez said something along the lines of "Frank's my guy."

Cano also testified about the training required for security guards. He indicated that even with the appropriate training, a security guard must be affiliated with or employed by a licensed security guard company to perform security services.

The State of Texas keeps track of licensing for guards through an operating system called "TOPS." TOPS records indicated Tovar was a commissioned security officer at the time of the incident. Cano testified, however, that before the incident, Delta informed TOPS that Tovar was not affiliated with Delta and TOPS had not yet processed that paperwork. Cano did not give Tovar permission to work under Delta's license with a different company. At the time of trial in December 2020, TOPS showed that Tovar was not an active security guard, meaning he was not working for a security company and should not be working as a guard.

Cano stated it was standard practice in the security guard industry for the client to tell the guard company what they need. Cano testified that putting hands on someone as a security guard is a last resort; talking to people solves 90% of problems. In Cano's experience as a security guard, he had never seen a person attacked or body slammed, handcuffed, and pepper sprayed.

Tovar testified that on the night in question, he was outside trying to control the flow of people coming into the restaurant. A waitress came out to tell him he was needed inside. Tovar saw Martinez "going at it" and "being belligerent" with the shift manager. He wanted to deescalate the situation and asked Martinez to calm down. After hearing from the waitress, he asked the cashier to take the charge off the bill. When the cashier spoke to Tovar in Spanish, Martinez got upset at the use of Spanish. Martinez leaped over the counter and cursed at the cashier. Tovar said, "we're done" and "let's go ladies." He grabbed Martinez with two hands around her

–10–

shoulder or upper body to get her off then counter, then he placed a hand on Martinez's left hand and another hand behind her to escort her outside. Martinez was combative and became more irate outside. Tovar smelled alcohol on her. He told Martinez and her daughters to leave the premises. Martinez then took a swing at him. He used two defensive tactics—a wrist lock and then an arm bar—to take Martinez to the ground. Once he had her in control on the ground, he tried to handcuff her. She started fighting him. She bit his arm, dug her nails into his arm, and grabbed and squeezed his testicles. At that point, Tovar administered pepper spray.

Tovar's position was that he used "necessary force." He denied body slamming Martinez and denied placing his knee on her chest. He stated he had control of Martinez's body as he took her to the ground and she did not hit her head hard on the ground.

Tovar had a military and law enforcement background. He helped Cano start Delta. After seeing a viral video of a brawl at El Paisano, Tovar approached El Paisano about entering into a guard services agreement with Delta. He thought El Paisano needed security to deter crime and to deal with the homeless and intoxicated patrons. He proposed a plan, and the restaurant's representative approved it. Delta employees decided where to position themselves at the restaurant and how tasks were performed there. Tovar testified he provided his gun, bulletproof vest, and pepper spray.

Tovar said he left Delta sometime in 2017. Although he did not remember the date, he acknowledged that at the time of the August 2017 incident, he no longer worked for Delta. He claimed he worked for another security company, Bureau Crime Force Investigators ("BCFI"). Tovar stated that he wrote a report about the incident and gave a copy to BCFI and to Salazar. According to Tovar, the contract for security services at El Paisano was transferred from Delta to BCFI. He testified that Cano's letter was "false" and that he, not Cano, delivered the letter terminating Delta's relationship with El Paisano to the restaurant. He gave El Paisano a new contract with BCFI and Salazar signed it. Tovar had just told El Paisano's attorney about the existence of a contract between El Paisano and BCFI on the day of his testimony.

Tovar said he is still registered as a security officer. There had never been a time he was not licensed. He had always been "carried through a company." Tovar agreed that nothing on the TOPS platform showed he was ever affiliated with BCFI. He did not know why and blamed BCFI.

El Paisano moved for a directed verdict in part on grounds that Martinez did not put forth testimony from a medical expert that the incident caused her injuries. The trial court denied the motion and at the close of trial on December 15, 2020, orally ruled in Martinez's favor. On February 1, 2021, the trial court signed a final judgment, awarding Martinez actual damages against El Paisano of $78,396.01, plus

prejudgment interest and court costs. El Paisano requested findings of fact and conclusions of law and moved for a new trial.

The trial court issued its findings of fact and conclusions of law on March 5, 2021. The court's findings and conclusions included additional discovery sanctions against El Paisano that the court imposed on its own motion. The court made specific findings regarding El Paisano's abuses of the discovery process. Among them was a finding that Tovar testified he provided certain documents to El Paisano—proof of insurance, a written report about the incident, and a contract between El Paisano and BCFI—none of which were produced by El Paisano in this case. The court determined that the appropriate sanction was to strike the portions of El Paisano's answer and affirmative defenses pertaining to the nature of the relationship between the restaurant and Tovar, specifically El Paisano's denying that Tovar was its employee. The findings state that the reason for the deviation between that sanction and the one previously imposed was due to the additional information revealed at trial through Tovar's testimony and "additional unproduced evidence."

The trial court also made findings and conclusions about the incident at the restaurant. Among other things, the trial court found that Tovar and Obregon were employees of El Paisano and that they were acting in the scope of their employment on the night of the incident. The court found that Martinez was injured and "received a concussion to her head, bruises, and other injuries." In addition, she suffered from mental anguish stemming from the incident. Although Martinez's proposed findings

–13–

included a finding that she suffered a traumatic brain injury, the trial court did not make such a finding. The court further found that Martinez suffered from extensive preexisting injuries which were aggravated by the incident. Martinez was highly intoxicated which contributed to the incident occurring.

As for theories of liability, the court found that Tovar and El Paisano falsely imprisoned Martinez and that Tovar committed an assault against her. The court also found that El Paisano, Tovar, and Martinez were negligent and that their negligence proximately caused the occurrence or injury. The court apportioned responsibility for the incident as follows: El Paisano was 50% responsible, and Tovar and Martinez were each 25% responsible. No findings were made on gross negligence or intentional infliction of emotional distress.

The trial court also made findings on Martinez's damages. It found that she incurred reasonable and necessary medical bills proximately caused by the incident in the amount of $20,896.01. In addition, the court found that the following amounts would fairly and reasonably compensate Martinez for her injuries that resulted from the occurrence: $15,000 for past physical pain, $15,000 for past mental anguish, $5,000 for future mental anguish, $5,000 for loss of earnings or earning capacity sustained in the past, $2,500 for past disfigurement, and $15,000 for past physical impairment. With the exception of the medical bills, the amounts the court awarded were substantially less than Martinez sought.

On April 12, 2021, the trial court amended its judgment to take into account Martinez's proportionate responsibility. The court reduced the amount of her actual damages to $58,776.76. El Paisano again filed a motion for new trial, which was overruled by operation of law. This appeal followed.

## SUFFICIENCY OF THE EVIDENCE

El Paisano challenges the sufficiency of the evidence in several respects. In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *Sheetz v. Slaughter*, 503 S.W.3d 495, 502 (Tex. App.—Dallas 2016, no pet.). When the appellate record contains a reporter's record, as in this case, findings of fact are not conclusive and are binding only if supported by the evidence. *Id*. We review a trial court's findings of fact under the same legal and factual sufficiency of the evidence standards used when determining if sufficient evidence exists to support an answer to a jury question. *Id*.

When an appellant challenges the legal sufficiency of an adverse finding on which it did not have the burden of proof, it must show there is no evidence to support the adverse finding. *Great Am. Lloyds Ins. Co. v. Vines-Herrin Custom Homes, L.L.C.*, 596 S.W.3d 370, 374 (Tex. App.—Dallas 2020, pet. denied). If more than a scintilla of evidence exists to support the finding, the legal sufficiency challenge fails. *Id*. When a party attacks factual sufficiency of an adverse finding, we consider all the evidence supporting and contradicting the finding. *Id*. We set

aside the finding for factual insufficiency only if it is so contrary to the evidence as to be clearly wrong and manifestly unjust. *Id.*

### *Vicarious Liability*

We begin with El Paisano's second issue, in which it contends the evidence is legally and factually insufficient to establish that it was vicariously liable for Tovar's intentional tort of assault.[3]  It argues the record is "contradictory and unclear" as to whether the trial court considered Tovar be an independent contractor or an employee. El Paisano maintains Tovar was an independent contractor because it did not retain control over his work.  Alternatively, it argues that even if Tovar is its employee, his conduct fell outside the course and scope of his employment.

Martinez responds that El Paisano waived this issue because it does not complain on appeal about the trial court's sanction in its findings of fact and conclusions of law that established Tovar's status an employee.  In fact, El Paisano's opening brief does not mention the post-trial sanctions at all.  In its fourth issue, El Paisano challenges the discovery sanctions imposed at the start of trial only— striking of its designation of Delta as a responsible third party and the monetary sanctions.

---

[3] El Paisano also contends the evidence is insufficient to show its vicarious liability for the intentional tort of false imprisonment and to prove the elements of false imprisonment.  It has not challenged the sufficiency of the evidence to prove an assault.  Therefore, we focus on the restaurant's vicarious liability for the assault. In light of our conclusion, we do not address El Paisano's arguments about false imprisonment.

In its reply brief, El Paisano disagrees that the trial court deemed Tovar to be an employee as a discovery sanction. It asserts that the wording of the trial court's findings are confusing. In the event the trial court did deem Tovar to be an employee as a sanction, El Paisano argues the imposition of additional sanctions well after the trial ended and without notice and a hearing violates due process and the Texas Supreme Court's ruling in *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.3d 913 (Tex. 1981).

It is clear from the trial court's findings that the court deemed Tovar to be an El Paisano employee as an additional discovery sanction after trial. We share El Paisano's concerns about the fact that the trial court imposed new sanctions well after trial in its findings of fact and conclusions of law. However, we conclude that any error in the post-trial sanction is harmless. First, because the trial court's sanction deeming Tovar an employee was imposed after the trial ended, El Paisano was not hampered in its ability to present its evidence to the contrary. Next, in addition to deeming Tovar to be an employee as a sanction, the trial court found that Tovar was an El Paisano employee based on the evidence presented at trial. As will be discussed below, the evidence is sufficient to support that finding.

To prove an employer's vicarious liability for its worker's tortious conduct, a plaintiff must show that the worker was (1) an employee and (2) was acting in the course and scope of his employment. *Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 131 (Tex. 2018). The test to determine whether a worker is an employee

–17–

or an independent contractor is whether the employer has the right to control the progress, details, and methods of operations of the employee's work. *Thompson v. Travelers Indem. Co. of R.I.*, 789 S.W.2d 277, 278 (Tex. 1990). The employer must not control merely the end sought to be accomplished, but also the means and details of its accomplishment as well. *Id.* We measure the right to control by considering: (1) the independent nature of the worker's business; (2) the worker's obligation to furnish necessary tools, supplies, and materials to perform the job; (3) the worker's right to control the progress of the work except about final results; (4) the time for which the worker is employed; and (5) the method of payment, whether by unit of time or by the job. *Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002) (citing *Pitchfork Land & Cattle Co. v. King*, 346 S.W.2d 598, 603 (Tex. 1961)).

It was undisputed that a security guard must be affiliated with or employed by a licensed security guard company to perform security services. Martinez's evidence showed that Tovar was not affiliated with a security company at the time of the assault. When Cano informed El Paisano that no further business should be conducted with Tovar, El Paisano's owner Ramirez did not care that Tovar no longer worked for Delta. He was still her "guy." Tovar claimed to work for BCFI at the time of the incident and said that the contract for security services at El Paisano had been transferred to BCFI. Nothing on TOPS reflected Tovar's affiliation with BCFI. Similarly, Tovar testified there was a written contract between BCFI and El Paisano,

however, the document was not presented as evidence. In addition, there was evidence that when Tovar was affiliated with Delta, El Paisano made checks out to Delta, but after Delta terminated Tovar, El Paisano made checks out directly to Tovar.

The trial judge did not find Tovar to be a credible witness. Before closing arguments, the judge informed the parties that he had determined El Paisano had the right to control Tovar. The judge did not believe Tovar was working for BCFI or that Tovar made a report about the incident or that "any of that stuff is true that he just brought up today." As the sole judge of the credibility of the witnesses, the trial judge was free to disbelieve Tovar's testimony that he worked for BCFI and that BCFI had contracted with the restaurant.

Evidence that at the time of the event Tovar was not working for an independent security guard company, but rather directly for El Paisano without a license supports the conclusion he was an El Paisano employee. Further, there was evidence El Paisano controlled the details of Tovar's work. In her deposition, Salazar testified that if a patron was misbehaving, staff would tell security to handle the situation. She indicated that before Tovar had the ability to throw someone out of the restaurant, staff would have to first give an order. On the night of the incident, El Paisano's manager directed Tovar to remove Martinez from the restaurant without words. The evidence is legally and factually sufficient to support the trial court's finding that Tovar was an El Paisano employee.

El Paisano argues that even if Tovar was its employee, it is not vicariously liable because his intentional tort was outside the course and scope of his employment. An employer is liable for the intentional tort of its employee when the act, although not specifically authorized by the employer, is closely connected with the employee's authorized duties. *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 617–18 (Tex. 1999). If the intentional tort is committed in the accomplishment of a duty entrusted to the employee, rather than because of personal animosity, the employer may be liable. *Id.* at 618. When an employee commits an assault, it is for the trier of fact to determine whether the employee ceased to act as an employee and acted instead upon his own responsibility. *G.T. Mgmt., Inc. v. Gonzalez*, 106 S.W.3d 880, 884 (Tex. App.—Dallas 2003, no pet.).

El Paisano compares this case to *Harris v. Mastec North America, Inc.*, No. 05-19-00955-CV, 2020 WL 6305028 (Tex. App.—Dallas Oct. 28, 2020, no pet.) (mem. op.). In *Harris*, a cable TV installer assaulted the plaintiff in her home while he was there to install service. The plaintiff argued the cable company was vicariously liable for the employee's actions. We upheld a summary judgment for the employer because there was no evidence the assault was closely connected with the installer's authorized duties or incidental to his authority to install cable services. *Id.* at *6. El Paisano argues that as in *Harris*, it was not enough that Tovar was at work when he committed assault. This case, however, is more like *G.T. Management*. In *G.T. Management*, the plaintiff sued a dance club under a

–20–

respondeat superior theory after he was assaulted by the club's bouncers. 106 S.W.3d at 882–83. In a bench trial, the judge found that the club was liable for the bouncers' actions. On appeal, we found the evidence sufficient to support a finding that the bouncers acted in the course and scope of their employment. *Id.* at 885. Here, Tovar was hired in part to control El Paisano's drunk, late-night crowd. As in *G.T. Management*, the factfinder could have determined that Tovar's conduct was of the same general nature as his authorized duties or incidental to those duties. *See id.* at 884. The evidence is legally and factually sufficient to support the finding that Tovar acted in the course and scope of his employment. We overrule El Paisano's second issue.

### *Causation*

In its first issue, El Paisano contends the evidence is legally and factually insufficient to prove causation in two respects. It first contends its negligence was not the proximate cause of the incident. El Paisano's argument is related to Martinez's claim that the restaurant was negligent in hiring, training, and supervising Tovar. El Paisano contends Martinez did not establish cause in fact because nothing in Tovar's background would have caused the restaurant not to hire him. It also argues Martinez did not establish foreseeability because nothing about Tovar's behavior prior to the incident put the restaurant on notice that he might commit an assault.

The trial court found that Tovar committed an assault against Martinez by intentionally, knowingly, or recklessly causing her bodily injury. The trial court also determined the restaurant was vicariously liable for Tovar's actions because he was a restaurant employee acting in the course and scope of his employment on the night of August 18, 2017. The evidence is sufficient to support El Paisano's vicarious liability for Tovar's actions. As a result, this Court need not address El Paisano's arguments about whether its negligence in hiring, training, or supervising Tovar was a proximate cause of the incident. *See* TEX. R. APP. P. 47.1.

Next, El Paisano argues the evidence is insufficient to prove the incident caused Martinez's medical expenses because there was no testimony from a medical expert to show that Tovar's conduct caused Martinez's injuries. We agree that expert testimony was necessary to prove that the incident at El Paisano caused some of Martinez's medical conditions.

The record includes hundreds of pages of Martinez's medical records, as well as affidavits proving up her medical bills. Martinez asked for $20,896.01 in past medical expenses. The trial court awarded the full amount, finding that the incident was the proximate cause of her medical bills. The billing affidavits show about $18,500 in medical expenses, a discrepancy El Paisano raises in issue three.

Affidavits proving up medical bills are evidence that the expenses were reasonable in amount and necessary for treatment of Martinez's conditions, but the bills are not evidence that all the conditions were caused by Tovar's conduct.

–22–

*Guevara v. Ferrer*, 247 S.W.3d 662, 669 (Tex. 2007); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 18.001. To establish the necessary link, Martinez relied on her own testimony and that of her daughters. The question is whether lay testimony was sufficient in this case.

The general rule has long been that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors. *Guevara*, 247 S.W.3d at 665; *Edes v. Arriaga*, No. 05-17-01278-CV, 2019 WL 2266391, at *4 (Tex. App.—Dallas May 24, 2019, no pet.) (mem. op.). Lay testimony may be used as evidence of causation in certain circumstances, but "[w]hen expert testimony is required, lay evidence supporting liability is legally insufficient." *Jelinek v. Casas*, 328 S.W.3d 526, 533 (Tex. 2010). Lay evidence is allowed to establish causation "in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability," the causal relationship between the event and the condition. *Id.* (quoting *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984)). Thus, "lay testimony establishing a sequence of events which provides a strong, logically traceable connection between the event and the condition" could suffice to support a causation finding between the assault on Martinez and basic physical conditions that (1) are within the common knowledge and experience of laypersons, (2) did not exist before the incident, (3) appeared after and close in time to the incident, and (4) are within

the common knowledge and experience of laypersons caused by an assault. *See Guevara*, 247 S.W.3d at 666–67.

For example, *Guevara* explained that expert testimony would not be necessary to support a finding of causation if the plaintiff was pulled from a damaged automobile with overt injuries such as broken bones or lacerations and undisputed evidence which reasonable jurors could not disbelieve showed that he did not have such injuries before the accident. *Id.* at 667. In such a case, "the physical conditions and causal relationship between the accident and the conditions would ordinarily be within the general experience and common knowledge of laypersons." *Id.*

Martinez spent several hours at Parkland Hospital immediately after she was injured. After that, she sought additional treatment. Martinez's records from an orthopedist visit a week after the incident show her pelvis, spine, and shoulder were still tender. She had bruising on her right shoulder, her left upper arm, and her legs. Martinez had a diminished range of motion in her spine and walked with an "antalgic gait." Martinez had CT scans of her spine and pelvis performed that same day, August 24, 2017. The scans showed no fracture to her spine or pelvis.

Martinez's primary care physician sent her to a neurologist. As previously mentioned, on August 31, 2017, the neurologist noted several conditions, including post-concussive syndrome; spells of alteration of awareness and new onset hand jerking; post-traumatic dementia, post-traumatic loss of taste and smell, and post-traumatic cervical and lumbar radiculopathy. In connection with the spells of

–24–

alteration of awareness and hand jerking, the doctor noted that she needed to rule out post-traumatic seizure disorder. Martinez returned to the neurologist a few more times. Records from follow-up visits in October and November 2017 show Martinez was still had most of the conditions previously noted by the neurologist. Martinez complained of lumbar pain and daily headaches. A neurological exam showed she still had decreased concentration, attention, and informational processing speed. An MRI of her brain was abnormal due to "encephalomalacia and gliosis . . . felt to be secondary to old trauma." The neurologist ordered closed-circuit TV-EEG monitoring due to Martinez's symptoms, which Martinez underwent from December 11 through December 14, 2017. The results were normal. After the EEG Martinez continued to see the neurologist for headaches. She stopped seeing the doctor when she lost her job and her insurance.

Some of Martinez's injuries from the El Paisano incident fall within the kinds of "basic" injuries identified in *Guevara* in which expert testimony regarding the causal connection between an occurrence and a physical condition is unnecessary. *Id*. at 667. Martinez was forcefully removed from the restaurant and slammed onto the concrete outside. Immediately after the event, her head, back, pelvis, shoulder, and arm hurt. Emergency room records from that night indicate Martinez complained of shoulder, pelvic, and back pain and exhibited tenderness. A week later, her pelvis, back, and shoulder were still tender and she had bruising on her

shoulder, arm, and legs. Lay testimony was sufficient to connect these immediate injuries and medical expenses for them to the incident at the restaurant.

But many of Martinez's conditions, such as memory loss, loss of the senses of smell and taste, spells of alteration of awareness and new onset hand jerking, and post-traumatic cervical and lumber radiculopathy, are not common or basic ones. And there was evidence Martinez had seizures before August 2017. Martinez's biggest medical expense by far was for a stay in an epilepsy monitoring unit for closed-circuit TV-EEG monitoring that took place almost four months after Martinez was assaulted by Tovar. Martinez was admitted to the unit on December 11, 2017 and discharged on December 14, 2017. The bill for that treatment was $13,971.06. Also, the bills from Martinez's primary care physician were for services between October 10, 2017 and December 19, 2018, well over a year after the incident and after Martinez had a stroke. The total for those services was over $1,700.

Martinez does not argue that her medical records provide sufficient expert evidence of causation. While they contain information about the symptoms Martinez reported to her providers, diagnoses, and treatment, without more, they are insufficient to establish a causal relationship. *See VIA Metro. Transit Auth. v. Barraza*, No. 04-13-00035-CV, 2013 WL 6255761, at *3 n.4 (Tex. App.—San Antonio Dec. 4, 2013, pet. denied) (mem. op.) (medical records did not offer additional evidence of causation where any evidence of causation was based on patient's statements to heathcare providers); *see also Burroughs Wellcome Co. v.*

–26–

*Crye*, 907 S.W.2d 497, 500 (Tex. 1995) (to constitute evidence of causation, expert opinion, whether in testimony or medical record, must rest in reasonable medical probability). Martinez maintains that her injuries were not outside the common knowledge and experience of laypersons. In making this argument, she refers to her condition at the hospital immediately following the event. She mentions the pelvic, shoulder, and back pain and tenderness she experienced that night. She also notes that days after the incident her doctor ordered imaging to rule out fractures. We agree that lay testimony is sufficient proof of causation for these kinds of injuries immediately resulting from a physical assault. But Martinez does not mention her more complex conditions, such as memory loss, the inability to taste or smell, and hand jerking possibly due to a seizure disorder. It is not within the common knowledge of laypersons that the type of assault in this case would cause these conditions. We conclude that without expert testimony a factfinder could not reasonably find a causal connection between all of Martinez's medical problems and the August 2017 incident. *See Williams v. Crawford*, No. 03-16-00696-CV, 2018 WL 1124306, at *10 & n.9 (Tex. App.—Austin March 2, 2018, no pet.) (mem. op.) (expert testimony necessary to establish causal nexus between accident and synovial cyst); *City of Laredo v. Garza*, 293 S.W.3d 625, 632–33 (Tex. App.—San Antonio 2009, no pet.) (concluding that lay testimony was not sufficient to prove medical causation of disc herniations and radiculopathy); *see also Kelley & Witherspoon, LLP v. Hooper*, 401 S.W.3d 841, 850 (Tex. App.—Dallas 2013, no pet.) (lay

–27–

testimony insufficient to establish causal connection between car accident and medical problems months and years afterward).

When there is some evidence of damages, but not enough to support the full amount awarded, we may either suggest a remittitur or remand to the trial court for a new trial. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Res. Corp.*, 299 S.W.3d 106, 124 (Tex. 2009); *Guevara*, 247 W.W.3d at 670; *see also* TEX. R. APP. P. 46.3. Given the complexity of Martinez's medical conditions and treatment, the proper amount of past medical expenses is not readily determinable. Accordingly, the appropriate remedy is to reverse and remand for a new trial. Although the evidence supports the trial court's finding that El Paisano was vicariously liable, we may not order a new trial on unliquidated damages only where liability was contested. *Estrada v. Dillon*, 44 S.W.3d 558, 562 (Tex. 2001); TEX. R. APP. P. 44.1(b). We sustain El Paisano's first issue.

### DAMAGES

In its third issue, El Paisano contends there is legally and factually insufficient evidence to support the damages awarded to Martinez for past physical pain, past mental anguish, future mental anguish, past loss of earnings or earning capacity, past disfigurement, and past physical impairment. As will be discussed below, there is legally sufficient evidence of each of these damage elements. We do not consider whether the awards are excessive. At most, El Paisano would be entitled to a remand for excessive damages rather than rendition and we have already determined it is

entitled to a new trial. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998) (standard of review for excessive damages complaint is factual sufficiency of the evidence).

***Past Loss of Earnings or Earning Capacity***

The trial court's findings of fact indicate it awarded $5,000 for past loss of earnings *or* earning capacity. *See Geoscience Eng'g & Testing, Inc. v. Allen*, No. 01-03-00402-CV, 2004 WL 2475280, at *6 (Tex. App.—Houston [1st Dist.] Nov. 4, 2004, pet. denied) (mem. op.) (observing that courts have distinguished between past lost wages and loss of earning capacity). Past lost earnings are the actual loss of income due to an inability to perform a specific job after an injury. *Id.* El Paisano argues Martinez did not provide sufficient evidence to allow the factfinder to measure her earning capacity. It does not argue that the incident was not the cause of Martinez's loss of earnings or earning capacity. El Paisano argues Martinez's testimony about her earnings was insufficient and that she should have produced tax or payroll documents.

Martinez had worked in the medical field for at least 20 years, in roles that involved making appointments, answering the phone, verifying insurance, and other office duties. At the time of the incident, Martinez was employed with the Texas Institute of Orthopedic Surgery, her orthopedist's office, making $17.50 an hour. She made $45,000 in 2017 and a little less in 2018 due to her head injury. She lost her job in January 2019 because of the memory loss. Martinez looked for work since

–29–

then, but cannot perform some jobs due to her poor memory. In late 2019, she got a job in another medical office, but was later laid off because she could not fulfill her duties.

Evidence showed that at a minimum Martinez was unemployed for several months in 2019 because she could not perform her job duties. At the time of the incident, she was making $17.50 an hour. At that rate, the court's $5,000 award comes to about 286 hours, or less than two months, of lost wages. We conclude Martinez's testimony provided legally sufficient evidence to support the award. *See Dawson v. Briggs*, 107 S.W.3d 739, 749–50 (Tex. App.—Fort Worth 2003, no pet.) (plaintiff's testimony about hourly wage and hours worked per week sufficient to support award of past lost wages).

### Disfigurement

The trial court awarded Martinez $2,500 for past disfigurement. Without citation to any authority, El Paisano argues that no evidence was introduced to support a disfigurement finding.[4] Disfigurement has been defined as "that which impairs or injures the beauty, symmetry, or appearance of a person or thing; that which renders unsightly, misshapen or imperfect, or deforms in some manner." *Goldman v. Torres*, 161 Tex. 437, 341 S.W.2d 154, 160 (1960). Here, there was

---

[4] In its second motion for new trial, El Paisano asked the trial court to strike the disfigurement award because Martinez never pleaded disfigurement. El Paisano does not make this argument on appeal.

evidence Martinez had multiple bruises on her arms, legs, and shoulder as a result of the incident and also that the pepper spray caused redness in her eyes. We conclude this is more than a scintilla of evidence of past disfigurement to overcome a legal sufficiency challenge and express no opinion on whether the amount was excessive.

### Mental Anguish

The trial court awarded Martinez $15,000 for past mental anguish and $5,000 for future mental anguish. El Paisano argues that Martinez's mental anguish did not rise to the requisite level of severity.

Generally, an award of mental anguish damages must be supported by evidence that the nature, duration, and severity of mental anguish was sufficient to cause, and caused either a substantial disruption in the plaintiff's daily routine or a high degree of mental pain and distress. *Wal-Mart Stores Tex., LLC v. Bishop*, 553 S.W.3d 648, 668 (Tex. App.—Dallas 2018, pet. granted, judgm't vacated w.r.m.); *Mora v. Wine*, No. 05-19-00874-CV, 2021 WL 71431, at *6 (Tex. App.—Dallas Jan. 8, 2021, no pet.) (mem. op.) (citing *Bennett v. Grant*, 525 S.W.3d 642, 648 (Tex. 2017)). Martinez testified about her mental health. She said she suffered severe depression after this incident, as well as panic attacks and anxiety. She also had difficulty sleeping. Medical records from March 2018 show she was "tearful and upset" because she had difficulty walking. Months after the incident, she appeared anxious and withdrawn and she exhibited a "depressed mood." As El Paisano points

out, some of this was due Martinez's divorce. But there was evidence her injuries contributed to her divorce. We conclude Martinez presented legally sufficient evidence of mental anguish. Because there is some evidence of the existence of compensable mental anguish and El Paisano is entitled to a new trial, we do not consider whether there was evidence demonstrating a rational connection between the injuries suffered and the *amount* awarded under the recent guidance in *Gregory v. Chohan*, 670 S.W.3d 546 (Tex. 2023).

### Past Physical Pain

The trial court determined that Martinez was entitled to $15,000 for past physical pain. El Paisano argues that any pain Martinez suffered may have been caused by her 2016 injury. It contends that, as with her medical expenses, she needed expert testimony to show the incident caused all of her pain.

The process of awarding damages for amorphous, discretionary injuries such as pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss. *Wal-Mart*, 553 S.W.3d at 667. Once the existence of some pain has been established, a great deal of discretion is given to the factfinder in awarding the amount it deems appropriate. *Id.* at 668; *Mora*, 2021 WL 71431, at *6. As with Martinez's medical expenses, there is evidence that the assault at El Paisono caused her some pain. As such, the evidence is legally sufficient to support an award for past physical pain. We need not consider whether the amount awarded was excessive.

### Past Physical Impairment

The trial court awarded Martinez $15,000 for past physical impairment. Physical impairment is distinct from pain and suffering and includes limitations on physical activities. *Wal-Mart*, 553 S.W.3d at 668; *Mora*, 2021 WL 71431, at *6. It also encompasses loss of enjoyment of life and loss of the injured person's former lifestyle. *Mora*, 2021 WL 71431, at *6. El Paisano contends Martinez's testimony did not provide sufficient evidence that her previous activities were impeded by the assault. It also argues that although she developed a hand tremor after the incident, she did not present evidence that the hand tremor prevented her from doing activities she previously enjoyed or that the tremor was caused by the incident.

Martinez testified that her headaches, pain, and memory loss affected her lifestyle and ability to have a normal relationship with her family, especially her children and grandchildren. Her injuries made playing with her grandchildren hard; she could not enjoy them as she used to. She was unable to complete everyday tasks such as grocery shopping. She also used to enjoy gardening. We conclude that this testimony was legally sufficient to support an award for past physical impairment.

El Paisano argues that the trial court's award of $20,896.01 for past medical expenses is more than the total amount of Martinez's expenses as reflected in the §18.001 affidavits. In light of our resolution of El Paisano's first issue, we do not need to address this argument. Finally, El Paisano contends it should only be liable for 50% of Martinez's damages, not 75% of the damages as the trial court's judgment

provides. Because we are remanding for a new trial, we need not consider this argument. We overrule El Paisano's third issue.

## DISCOVERY SANCTIONS

In its fourth issue, El Paisano contends the trial court abused its discretion in imposing discovery sanctions. As stated before, El Paisano complains about the trial court's December 8, 2020 pretrial sanctions, not the sanctions imposed post-trial. It argues the trial court's striking of the designation of Delta as a responsible third party was excessive and not directly related to its conduct. El Paisano characterizes its conduct as "conflicting testimony" from its employees Salazar, Ramirez, and Murillo about who was the cashier at the time of the incident. It also contends the monetary damages awarded were unreasonable.

Rule of civil procedure 215 generally leaves discovery sanctions to the sound discretion of the trial court. *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 884 (Tex. 2017) (citing *TransAmerican*, 811 S.W.2d at 917); *see* TEX. R. CIV. P. 215. We review a trial court's imposition of discovery sanctions for a clear abuse of discretion. *Horizon*, 520 S.W.3d at 884. The broad discretion granted to trial courts to impose discovery sanctions is not unlimited; the award must further one of the purposes of discovery sanctions, either (1) to secure compliance with the rules of discovery; (2) deter other litigants from violation discovery rules; or (3) punish parties that violated the rules of discovery. *Id.* Further the sanctions must be just, no more severe than required to further their legitimate purposes, and

specifically related to the harm done by the condemned conduct. *Id.* Courts must consider the availability of less stringent sanctions and whether such lesser sanctions would fully promote compliance. *Schindler Elevator Corp. v. Ceasar*, 670 S.W.3d 577, 589 (Tex. 2023); *TransAmerican*, 811 S.W.2d at 917.

Contrary to El Paisano's assertion, its conduct did not amount to just conflicting deposition testimony from its witnesses. In its order on the Fourth Motion for Sanctions, the trial court detailed El Paisano's history of discovery abuse in this case. It found: the restaurant abused the discovery process by resisting discovery, failing to designate and properly disclose witnesses despite having knowledge of their identities and by resisting discovery on the hiring, retaining, and supervision of security guards; El Paisano caused Martinez to spend needless time, effort, and expense in pursuing these issues; El Paisano had not properly designated witnesses or produced relevant discovery on the issue of the hiring of Tovar, the nature of the employment relationship between the restaurant and Tovar, any involvement of Delta as the security company at the time of the incident, and the restaurant's control over Tovar; Murillo and Ramirez provided evasive and misleading answers on the employment relationship between El Paisano and Tovar, the amount of control the restaurant exercised over security, and the identification of people with that information; and El Paisano's owner made material misrepresentations in discovery responses and deposition testimony. The record supports these findings.

–35–

El Paisano's discovery conduct prevented Martinez from getting information about the restaurant's relationship with Tovar and whether it employed him directly or employed a security company. The striking of its responsible third party designation was tied to this conduct. While El Paisano argues the trial court failed to consider the availability of less stringent sanctions, it fails to acknowledge that Martinez filed four motions to compel discovery before the court imposed the complained-of sanctions. In addition, the court granted a previous motion for sanctions for El Paisano's discovery conduct, yet El Paisano's discovery abuses continued. This is not a case where the trial court failed to consider less stringent sanctions. And the trial court imposed less stringent sanctions than Martinez sought. We conclude the striking of El Paisano's designation of Delta as a responsible third party was a just sanction.

Even if it was error to strike the restaurant's designation of Delta as a responsible third party, any error was harmless. *See* TEX. R. APP. P. 44.1(a). Both parties presented evidence that Tovar did not work for Delta at the time of the incident. Delta could not have been responsible for Martinez's injuries.

El Paisano also argues the monetary sanctions, $5,600 in attorney's fees and $1,249.59 for court reporter and translator expenses, were not reasonably caused by the discovery abuse. El Paisano suggests the $5,600 may have included fees that were not related to the discovery abuse. Martinez's counsel attached an affidavit about attorney's fees to the Fourth Motion for Sanctions. The affidavit indicates

–36–

Martinez incurred $35,000 in attorney's fees (100 hours at an hourly rate of $350) in connection with the motion and generally describes the legal work performed. Martinez connected her fee request to the discovery abuse by seeking fees related to prosecution of the Fourth Motion for Sanctions. Further, the trial court awarded a small percentage of the attorney's fees sought by Martinez. We cannot conclude the trial court abused its discretion by imposing a sanction of $5,600 in attorney's fees. *See Stromberger v. Turley Law Firm*, 315 S.W.3d 921, 924–25 (Tex. App.—Dallas 2010, no pet.).

El Paisano also argues the sanctions tied to deposition expenses are not appropriate because the depositions would likely have been taken anyway. El Paisano does not cite any authority for this standard of determining whether a sanction is appropriate, and we are not persuaded by the argument. Given El Paisano's discovery conduct, sanctioning it in the amount of expenses tied to the depositions of Murillo and Ramirez served the stated purposes of discovery sanctions.

Finally, El Paisano argues it was assessed $1,249.59 for court reporter fees twice because that amount was also included in the award of $3,770.02 in court costs. It merely directs us to the amended final judgment, which includes these amounts. El Paisano has failed to demonstrate that the court costs included the court reporter fees for the depositions. We conclude the trial court did not abuse its discretion in imposing the complained-of sanctions. We overrule El Paisano's fourth issue.

In conclusion, we affirm that portion of the trial court's judgment that imposes monetary sanctions against El Paisano.  In all other respects, we reverse the trial court's judgment and remand for new trial.


/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

210552F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

EL PAISANO NORTHWEST
HIGHWAY, INC., A/B/A
TAQUERIA EL PAISANO,
Appellant

No. 05-21-00552-CV     V.

ELIZABETH MARTINEZ, Appellee

On Appeal from the 68th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-17-17249.
Opinion delivered by Justice
Reichek. Justices Goldstein
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **AFFIRM** that portion of the trial court's judgment that awards Elizabeth Martinez attorney's fees and court reporter and translation fees as a sanction. In all other respects, the trial court's judgment is **REVERSED.** We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 30th day of August 2023.

–39–